Nonie Grubbs v. Kansas City Public Service Company, Appellant.
—45 S. W. (2d) 71.

Division One, December 21, 1931.

392

*Charles L. Carr, Harding, Murphy & Tucker* and *E. E. Ball* for appellant.

*Harry G. Kyle* and *Walter A. Raymond* for respondent.

ATWOOD, J.—This is a personal injury case growing out of a collision between a street car, owned by the Kansas City Railways Company and operated by its receivers, and an automobile in which respondent, Nonie Grubbs, was riding. Appellant, Kansas City Public Service Company, is the successor of the Kansas City Railways Company and as such defended the action.

The case was submitted under the humanitarian rule, plaintiff's petition stating "that on November 18, 1925, she was riding as a passenger in a Ford sedan which at that time was being driven and operated north on Benton Boulevard and was approaching the intersection of that street and St. John Avenue, both public streets in Kansas City, Jackson County, Missouri; that when the automobile in which plaintiff was riding reached St. John Avenue, it was turned east on St. John Avenue and along the south side of said street; that at that time the agents and servants of the receivers were driving and operating one of said receivers' street cars west along St. John Avenue and were approaching said intersection; that about seventy-five feet east of Benton Boulevard the wesbound car tracks on St. John Avenue turned towards the southwest and across the south side of St. John Avenue; that as the automobile in which plaintiff was riding reached a point on St. John Avenue about seventy-five

feet east of the east curb line of Benton Boulevard and approaching the said car tracks the agents and servants of the said receivers carelessly and negligently drove said street car around said turn on said track and into violent collision with the automobile in which plaintiff was riding, turning said automobile over and throwing plaintiff to the pavement with great force and violence,'' and that as a direct result thereof plaintiff received certain injuries. The petition further alleges ''that the aforesaid injuries and injurious consequences which are permanent, progressive and lasting were directly caused by the negligence of the defendant acting through its said agents and servants in this to-wit: That they negligently drove said street car into violent collision with the automobile in which plaintiff was riding after they saw or by the exercise of ordinary care could have seen plaintiff in a position of peril and oblivious to her danger in time by the exercise of ordinary care to have sounded a warning, slowed down said street car or stopped the same in time to have avoided the collision but negligently failed so to do.''

The answer of defendant, Kansas City Public Service Company, contains a general denial, and an allegation that plaintiff's ''injuries, if any, were caused by her negligence and/or the negligence of the driver of said automobile in which she was riding at said time, for which negligence this defendant is not liable,'' followed by specific allegations of negligence on the part of said driver.

Plaintiff's reply was a general denial. The verdict was for plaintiff and defendant appealed from the judgment rendered thereon.

Appellant first insists that the peremptory instruction offered by defendant at the close of plaintiff's case and also at the close of the whole case should have been given.

The collision occurred on St. John Avenue about 135 feet east of the intersection of that street with Benton Boulevard, which extends north and south. Defendant's double-track street railway extends from the east on St. John Avenue to a point about 150 feet east of Benton Boulevard where it makes a sweeping curve to the southwest across the northwest corner of the block immediately south of St. John and east of Benton. About 11:30 o'clock on the night of the collision plaintiff was riding north on Benton Boulevard in a Ford sedan with her husband and twelve-year-old daughter. As the automobile approached the intersection of Benton and St. John defendant's street car approached the curve above mentioned on the westbound track. The automobile turned east on the south side of St. John, the street car turned southwest on the curve and the collision occurred near the south curb of St. John Avenue. The automobile was hurled beyond the curb in a slightly southwesterly direction and overturned partly on defendant's eastbound track. Plaintiff was thrown to the pavement, suffering a scalp wound, bruises and shock which

she claims resulted in certain serious and permanent injuries. The left front part of the street car and the left side of the automobile bore marks of the collision.

In reviewing the trial court's ruling on defendant's peremptory instruction we must accept as true the evidence which tends to support the verdict (Steele v. K. C. Southern Ry. Co., 302 Mo. 207, 216, 257 S. W. 756), and in passing upon it we are required to make every inference of fact which a jury might, with any degree of propriety, have inferred in plaintiff's favor, but we are not at liberty to make inferences of fact in favor of defendant to countervail or overthrow either presumptions of law or inferences of fact in favor of plaintiff. [Buesching v. Gaslight Co., 73 Mo. 219, 231; Troll v. Drayage Co., 254 Mo. 332, 338, 162 S. W. 185; Maginnis v. Railroad, 268 Mo. 667, 676, 187 S. W. 1165.]

The evidence is conflicting as to whether or not the motorman sounded any warning between the time he began to round the curving track in St. John Avenue and the occurrence of the collision. Under the rule above stated we must assume that he did not, but counsel for appellant say that no warning was necessary because plaintiff's husband who was driving the automobile admitted seeing the street car while it was some distance away. Plaintiff's husband did testify that he first saw the street car just as he "made the turn off of Benton." We quote from his cross-examination as follows:

"Q. Did you observe it all the time from the time you first saw it until the time of the collision? A. Yes, sir; I thought it was going on west. . . . It was not making the curve when I first saw it. . . . I did not see it as it was curving. . . . I did not know it was going to turn until it hit."

Plaintiff also testified that she saw the street car while she was still on Benton and that it was going west. Contributory negligence is no defense in a case submitted under the humanitarian rule. [Schroeder v. Wells, 310 Mo. 642, 654, 276 S. W. 60.] Appellant contends, however, that one who knowingly and unnecessarily places himself in a position of imminent peril cannot invoke the humanitarian doctrine. As we observed in McGowan v. Wells, 24 S. W. (2d) 633, 638, 324 Mo. 652, some of the cases support this view. "But the later decisions are to the contrary. It is held in Banks v. Morris & Co., 302 Mo. 254, 267, 272, 257 S. W. 482, 484, 486, a Banc case, and several others since decided, that under the humanitarian doctrine the cause of the injured party's peril is immaterial (save, perhaps, when he voluntarily seeks injury, as with the intent of committing suicide or collecting insurance)." In the McGowan case we said that two factors must enter into a case under the humanitarian doctrine: "(1) The injured party must actually

be in or entering a position of imminent peril; (2) and the defendant must have actual or constructive notice of his peril.'' In that case the effect of plaintiff's contention was that because he saw two men standing at the stopping platform his own danger zone was extended, notwithstanding he watched the approaching street car up to the time he started across the track and observed that it never slackened its speed or gave any indication of stopping. We held that the observed presence of these men at the regular stopping platform did not extend plaintiff's danger zone, because plaintiff had no right to rely upon this indication when he actually saw by the motorman's failure to slacken the speed of the car that he was not going to make that stop.

In the instant case the record shows that neither plaintiff nor her husband, who was driving the car, was familiar with the part of St. John Avenue where the collision occurred or knew that the car tracks there swerved southwesterly across the street instead of continuing straight west. Whether or not they were negligent in failing to observe when they turned into St. John Avenue that the street car tracks did not extend that far west is, as already observed, not a question in the case as it was submitted. However, defendant's motorman was not only aware of this peculiar condition, but must have known from the time he approached the curve from the east and saw this automobile about 150 feet away at the intersection of Benton Boulevard and St. John Avenue coming along the south side of St. John at a speed of 25 or 30 miles an hour that there would be a collision unless one vehicle or the other was stopped. Witness Engle, who was seated in the right front seat of the street car, testified that he first saw the automobile at the street intersection 135 or 140 feet away approaching on the south side of St. John Avenue at what appeared to him to be a speed of thirty miles an hour, and he never noticed any change in its speed up to the time of the collision. He said the street car was starting on the curve when he first saw the automobile and he ''knew something was going to happen if somebody did not stop.'' Defendant did not stand on peremptory instruction requested at close of plaintiff's case, and the motorman testified that the automobile was only 25 or 30 feet away from him when he decided it was not going to slacken its speed, but his former testimony was introduced in evidence showing that he then said that the automobile was traveling about 25 or 30 miles an hour when he first saw it at the street intersection and that it did not slacken any until the collision. There were no streets or alleys leading off of St. John Avenue between its intersection with Benton Boulevard and the street-car tracks curving southwesterly off of St. John. Hence, from the time the motorman first saw the automobile he must have known that if it did not stop it would cross the street car tracks near their

intersection with the south curb of St. John Avenue. We are not forced to any fine calculations as to when plaintiff entered the danger zone. There was substantial evidence that when the street car began to make the curve (at this point the north rail of the track was about 32 feet straight north of the south curb), it was traveling only four or five miles an hour; that it could have been stopped within a distance of six or eight feet; but that its speed was not slackened or the car stopped until the collision occurred, at which time the left side of the street-car fender extended over the south curb or was only five or six feet north of it. The evidence clearly made a case for the jury under the humanitarian rule, and defendant's demurrer was properly overruled.

Counsel for appellant next say that the court erred "in permitting counsel for plaintiff to question plaintiff and her husband concerning the street-car tracks making a turn at the place in question and their knowledge thereof." No supporting authorities are cited and we think the trial court did not err in this respect. In the light of defendant's answer and insistence throughout the case that plaintiff's injuries were caused by her own negligence and/or that of her husband we think this was a proper subject of inquiry. Furthermore, notwithstanding their objections to this character of testimony counsel for defendant rigidly cross-examined these witnesses as to their actual knowledge of the existing condition, but their testimony as a whole failed to disclose any knowledge or observation on their part, such as appeared in the McGowan case, that would reasonably remove their impression that the street car would continue to move westward on the north side of St. John Avenue. Again we say, as the case was submitted, it was a question of their actual knowledge and not their negligence in failing to discover the true condition existing.

Counsel for appellant also say that the court erred "in taking too active a part in the trial of this case, and in practically taking over the examination in chief of certain witnesses, and in asking leading suggestive questions." Counsel content themselves with citing certain pages of the abstract of the record showing examination of witnesses Gladys and G. C. Rhodus, but we find no objections interposed or exceptions saved by defendant. In such state of the record there is nothing before us for review under this head.

The trial court excluded testimony tending to show that months subsequent to the collision here complained of plaintiff's husband was brought to the General Hospital in an intoxicated condition. Counsel for appellant claim this was reversible error, but cite no supporting authorities. In the course of his examination as a witness plaintiff's husband tes-

tified that he had never been drunk. This excluded testimony was admittedly offered for the sole purpose of impeaching this witness. He was not the plaintiff, and there is abundant authority that in such case the impeaching party is relegated exclusively to the cross-examination of the witness to be impeached. [Miller v. The Journal Company, 246 Mo. 722, 726, 152 S. W. 40; Wendling v. Bowden, 252 Mo. 647, 695, 161 S. W. 774.] The court did not err in excluding this testimony.

It is next contended that the court erred in sustaining plaintiff's objection to the testimony of witness Lamberth "that the street car slowed down to a stop just before the Ford went across and hit the car." It is unnecessary for us to rule this point, because, even if it was error to exclude this statement as a conclusion of the witness, it was harmless error. The same witness was shortly thereafter permitted to testify as follows that the automobile did hit the street car.

"Q. Did you see the automobile up to the very moment of the collision? A. I saw it just before it hit.

"Q. Just a fraction of a second before the collision? A. Yes, sir.

"Q. I believe you stated that the ringing of the bell and the squeaking of the brakes and the crash were all at the same time? A. The crash was just a few moments after—the car was almost to a stop before it got hit."

In such case reversible error should not be predicated on prior exclusion of the same testimony. [Bryson v. Baum (Mo. Sup.), 278 S. W. 412, 415.]

Counsel for appellant next complain that the court erred "in ignoring objections made by defendant, and in refusing and failing to rule thereon." In the few instances sufficiently specified to claim our attention the record shows that defendant saved no exceptions to the court's failure to rule on the objections made. The rule in this state on appeal is that the court should not consider an objection on which the court has refused to rule when no exception was saved on the court's failure to rule. [Shanahan v. City of St. Louis (Mo. Sup.), 212 S. W. 851; Bank v. Hutton, 224 Mo. 42, 50, 123 S. W. 47; State v. Wana, 245 Mo. 558, 563, 150 S. W. 1065.]

It is next contended that the court erred in making prejudicial comment in the presence and hearing of the jury concerning the credibility of the testimony of witnesses M. R. Cole and the respondent Nonie Grubbs. We will review the only comments of the court relating to the testimony of these persons to which defendant made objections and saved exceptions. Mr. Cole was a member of the police department stationed near the intersection of Benton Boulevard and St. John Avenue on the night of

the collision. He was called as a witness by plaintiff. In connection with his recall for re-cross-examination by defendant's attorney the record reads as follows:

"Q. Mr. Kyle asked you if there was anything to indicate if the street car made a turn; those street-car tracks are there and the trolley poles are there and the trolley wire makes a turn? That indicates it? Answer it yes or no, and don't argue.

"THE COURT: Now, the Court will take care of this witness's conduct, Mr. Tucker.

"MR. TUCKER: Is not that true?

"THE COURT: There is nothing wrong about this witness's testimony at all or his conduct, Mr. Tucker."

Counsel for defendant at this time made no objection and saved no exception to these remarks of the court, but on the next court day, in the absence of the jury, moved the discharge of the jury on the ground, among others alleged, that in the presence of the jury during the testimony of Officer Cole, when being examined by defendant, and when requested by defendant's counsel to answer the question yes or no, the court made the statement to the effect "that he could see nothing wrong with the testimony of this witness." When the full questions, answers and remarks above quoted are contrasted with the remark here considered apart from its context and criticised it seems apparent that the court would not be understood as vouching for the credibility of this testimony, but rather as finding no fault with the manner in which the witness testified, counsel having taken the unusual course of directly admonishing the witness not to argue instead of appealing to the court, if need be, to control the witness in this respect. We do not think defendant was prejudiced by these remarks. Again, in defendant's cross-examination of plaintiff, Mrs. Grubbs, the following occurred:

"MR. TUCKER: Q. Well, how far was the street car from the place where the accident took place when you first saw it? Now, I do not mean by that how far it was from you, but how far from the place where the collision occurred, when you first saw the street car?

"MR. KYLE: If you know. A. I cannot answer that.

"MR. TUCKER: Q. Give me the benefit of your best judgment. A. I am no judge of feet anyway.

"Q. Well, was it as far from where you are to where I am standing? A. It was quite a little ways away when I first saw it.

"Q. Was it as far as the back of the wall from the point of the accident when you first saw it? A. As nearly as I can remember it was a little bit away when I first saw it,

"THE COURT: I don't understand how you expect this witness to testify to this. This happened at half-past eleven o'clock at night. She was sitting in the back seat of the car with the child on her lap.

"MR. TUCKER: She said she saw it.

"THE COURT: She said she saw the car and the light.

"MR. TUCKER: Yes.

"THE COURT: How do you expect the witness to give you any benefit of how far it was? On the face of it, it would be impossible for her to do it."

Defendant then and there excepted to the above remarks of the court, and later moved to discharge the jury. It is now argued that these remarks were prejudicial because in a signed statement plaintiff had said that she was sitting in the front seat of the automobile and had testified as to distance in a former trial of the cause. The record shows that neither plaintiff's written statement nor her testimony given at a former trial had up to that time been admitted in evidence. We do not think the trial court's remarks were an abuse of its discretion or prejudicial to defendant.

Counsel for appellant also strenuously urge that the court erred "in refusing to grant the defendant a new trial, on the ground of newly discovered evidence shown by affidavits in support of motion for new trial." The twentieth ground alleged in defendant's motion for a new trial, filed within four days after rendition of the verdict but not sworn to, states that "new evidence has come to the knowledge of this defendant since the trial of this cause; that it is not owing to want of due diligence that it did not come sooner; that it is so material that it will probably produce a different result in a new trial if a new trial be granted; that it is not cumulative only; that said evidence, among other things, tends to show that the said Marie Grubbs, referred to in Exhibit 15 offered in evidence, lived at the address stated thereon to be 642 Garfield, which plaintiff refused to admit; that the telephone number stated thereon, Melrose 1656-J, was her telephone for all intents and purposes and was within the knowledge of plaintiff at the time she disclaimed to have any knowledge concerning that said telephone; that the diseases and physical conditions and impairments referred to in said physical history shown in Exhibit 15 is the physical history of this plaintiff; that the conditions set forth in said physical history are true; further, that plaintiff has been able to work and has actually been engaged in doing work and labor of the character which she denied, on the witness stand, that she was able to do." Seven supporting affidavits were filed within the time allowed by the court.

The first affidavit was by W. A. Elias, a representative of defendant's claim department. It recites that on February 28th affiant was in St. Joseph, Missouri, for the purpose of investigating certain matters incident to this case; that while there be obtained an affidavit from Dr. John Geiger, filed therewith, and learned that his record recites that a party by the name of Mrs. Rolla Grubb was in his office on March 7, 1915, and that the same person was admitted to the Ensworth Hospital in St. Joseph, Missouri, on March 25, 1917, and was there treated for the matters recited in said Geiger's affidavit; that the books of said hospital show entry No. 21890, March 25, 1917, "Mrs. Nora Grubb, 6029 Tennessee, age 22, F., housewife, Dr. Jacob Geiger, currettage, trachelorrophy, rectal ulcers;" that he found from the marriage records in St. Joseph that Nora Gaut and Rolley Grubb were married by a minister at St. Joseph, July 6, 1912; that he found that Nora Gaut was the former name of plaintiff in this case and that she is the same person as Nora Grubb referred to in said hospital record and as Mrs. Rolla Grubb referred to in said Geiger's affidavit.

The second affidavit, by R. C. Tucker, simply recites that from an investigation of the records of the Southwestern Bell Telephone Company, made by affiant on the 5th day of March, 1928, he found that in April, 1925, the telephone number Melrose 1656-J was given to telephone appearing in the name of Ida L. Dyer, whose affidavit was filed therewith.

The third affidavit is by Mrs. Ida L. Dyer. It recites that in September, 1924, she was rooming at 642 Garfield Avenue, Kansas City, with Mrs. Edith B. Richardson, with whom the Grubbs family also roomed; that in the latter part of March, 1925, Mrs. Grubb was sick for about two weeks when she was taken to the General Hospital in April, 1925, and remained there for about three weeks.

The fourth affidavit was by Mrs. Edith B. Hawkins. It stated that in September of 1924 she lived at 642 Garfield Avenue, Kansas City, Missouri; that Mrs. Nona Grubbs rented two rooms from her, which were occupied by Mrs. Grubbs, her husband and daughter until the latter part of March, 1925, when Mrs. Grubb was taken sick and went to bed; that about April 11, 1925, Mrs. Grubb was taken to the Kansas City General Hospital where she remained for about three weeks; that she knew Mr. and Mrs. Grubb for about one year before Mrs. Grubb was taken sick in the latter part of March, 1925; that during the time she knew Mr. Grubb he drank a good deal and that she knew of several times when Mr. Grubb would not come home and Mrs. Grubb would go out looking for him, and that on several occasions she had heard Mrs. Grubb say that she was

afraid to ride with her husband in the automobile when he was drinking.

The fifth affidavit was by Ethel Eaton. Affiant stated that she had known Nonie Grubb for the last nine years and during that time Mrs. Grubb frequently visited her father and mother, Mr. and Mrs. James Gaut, at 308 E. Kansas Avenue, St. Joseph, Missouri; that about eight years ago Nonie Grubb was a patient in the Ensworth Hospital, but she did not know the nature of her illness; that from the middle of November, 1927, until about January 1, 1928, Nonie Grubb was employed at Murray C. Kalis & Company, 403 Cherokee Avenue, St. Joseph, Missouri, wrapping packages of Flu Caps, working from eight A. M. to five P. M., and walking to and from her work, a distance of nine blocks; that she had seen Nonie Grubb hanging out clothes and sweeping and helping her mother with her work; that she had visited back and forth with her mother since her accident in Kansas City, Missouri, as often as she had before, and affiant did not see any difference in her appearance since her accident.

The sixth affidavit was by Murray C. Kalis. It states that affiant is a manufacturing chemist carrying on business at 309 Cherokee Street, St. Joseph; that he employed Nonie Grubb during the months of November and December, 1927; that her work consisted of wrapping packages of Flu Caps, and that her regular hours of work were from eight o'clock A. M. to 5:30 P. M.; that during the last week of December, 1927, he laid off Nonie Grubb, together with others, as the class of work she was engaged in ended at that time.

The seventh affidavit was that of Jacob Geiger. Affiant stated that he was a licensed practicing physician and surgeon and had been practicing medicine and surgery at St. Joseph, Missouri, for fifty-six years; that his records show that on March 7, 1915, Mrs. Rolla Grubb came to his office suffering from a disease which he diagnosed and treated as gonorrhea, involving the vagina, womb, fallopian tubes; that on March 25, 1917, she came to his office and he procured her admittance as a patient in the Ensworth Hospital, St. Joseph, Missouri, and treated her and operated upon her, doing a currettage, trachelorrophy, and treated her for rectal ulcer on March 26, 1917; that she left the hospital several days later and affiant has no recollection of treating the case further.

Counsel for plaintiff filed motion to strike these affidavits from the files, and in opposition to defendant's motion for a new trial filed transcript of parts of defendant's testimony at the second trial of this cause. Plaintiff's motion to strike and defendant's motion for a new trial were separately taken up and overruled.

The general rule is that a trial court's exercise of discretion in refusing or sustaining motions for new trial will not be disturbed

unless a manifest abuse of that discretion is made to appear. [Devine v. Wells, 300 Mo. 177, 186, 254 S. W. 65.] In the early case of State v. McLaughlin, 27 Mo. 111, 112, we held the following to be among the requisites necessary to obtain a new trial on newly discovered evidence: ''The party must show, 1st, that the evidence has come to his knowledge since the trial; 2nd, that it was not owing to the want of due diligence that it did not come sooner; 3rd, that it is so material that it would probably produce a different result if the new trial were granted; 4th, that it is not cumulative only; 5th, that the affidavit of the witness himself should be produced, or its absence accounted for; and, 6th, that the object of the testimony is not merely to impeach the character or credit of a witness.'' This holding has since frequently been approved. The law also requires that the evidence be set out in the motion for a new trial. [King v. Gilson, 206 Mo. 264, 280, 104 S. W. 52.]

The motion for new trial in the instant case recites (1) that Marie Grubbs, referred to in Exhibit 15 offered in evidence, lived at the address stated thereon to be 642 Garfield; (2) that Melrose 1656-J was her telephone for all intents and purposes; (3) that the diseases, physical condition and impairments referred to in said Exhibit 15 is the physical history of this plaintiff; (4) that the physical conditions set forth in said physical history are true; and (5) that plaintiff had actually been engaged in doing work of a character which she is alleged to have denied on the witness stand. Exhibit 15, offered by defendant, consisted of records of the Kansas City General Hospital relating to a patient named therein as Marie Grubb and covering a period from April 11, 1925, to May 1, 1925. These records gave the street address of Marie Grubb as 642 Garfield and her telephone number as Melrose 1656-J. The trial out of which this appeal arises was commenced February 20, 1928. The case was submitted to the jury on February 24, 1928. On the second day of the trial plaintiff, Nonie Grubbs, offered as a witness Dr. Clinton K. Smith, a specialist in the treatment of urinary diseases, who testified that he treated her at the Kansas City General Hospital in April or May, 1925, for urinary trouble. Plaintiff also testified that she was treated at the General Hospital by Dr. Smith in March or April, 1925. This case had been previously tried twice. The discrepancy between plaintiff's name and that of Marie Grubb, referred to in Exhibit 15, was apparent and counsel for defendant must have known at once that the burden was upon them to identify her as the plaintiff in this case. The only purpose of above items, 1, 2 and 3 of alleged newly discovered evidence was to contradict plaintiff and aid in establishing this identity. Even if such evidence is not wholly cumulative we think appellant failed to show proper diligence in procuring it. The same lack of diligence appears in procuring item 4 of the alleged

new evidence. The personal history sheet of Exhibit 15 contained the recital that the patient Grubb "had gonorrhea 10 years ago." At a former trial almost four months prior to the commencement of this trial plaintiff had testified that she was born at St. Joseph, Missouri, that she was married there, and had undergone an operation for appendicitis at the Ensworth Hospital there seven or eight years ago. A prompt examination of that hospital's records would undoubtedly have led defendant long before the last trial of this cause to all the information disclosed by the Geiger affidavit. As for item 5, it is merely cumulative at most. This assignment of error is ruled against defendant.

It is also urged that the court erred in giving instruction numbered 1 at the request of plaintiff. This instruction is as follows:

"The court instructs the jury that if you find and believe from the evidence that at the time and place mentioned in evidence plaintiff was riding as a passenger in a Ford sedan automobile which was being driven north on Benton Boulevard and was approaching the intersection of that street and St. John Avenue, both public streets in Kansas City, Jackson County, Missouri, if you so find, and that at that time a motorman of the defendant was operating one of defendant's Woodland Avenue street cars west on St. John Avenue, if you so find, and that the street car tracks on St. John Avenue turned toward the southwest and angled across to the south side of St. John Avenue for a short distance east of the east curb line of said Benton Boulevard, and if you so find, and that when the Ford automobile in which plaintiff was riding reached St. John Avenue it was turned east on said street, if you so find, and that said Ford automobile was then driven east on St. John Avenue and along the south side of said street, if you so find, and had approached a position of imminent peril of said defendant's street car then and there on said street car tracks, if you so find, and that the plaintiff was oblivious to her danger, if any, and that in approaching and entering such position of imminent peril, if any, plaintiff was not guilty of wanton or willful exposure to such impending danger, if you so find, and if you further find and believe the evidence that thereafter the motorman of defendant saw or by the exercise of ordinary care could have seen plaintiff in such position of imminent peril, if any, and he could thereafter by the exercise of ordinary care and with the appliances at hand and with safety to the passengers on said street car have sounded a warning, if you so find, and have slackened the speed of said street car, if you so find, and have stopped said street car before the said collision, if you so find, and that said motorman of said defendant could have thereby avoided the collision, if you so find, but negligently failed to sound any warning, and negligently

failed to slacken the speed of said street car, and negligently failed to stop the said street car, if you so find, before the said collision, if you so find, and that as a direct and sole result plaintiff sustained injuries, if any, then your verdict must be for the plaintiff and against the defendant even though you may find and believe from the evidence that the plaintiff was or was not negligent, and that the driver of the Ford sedan was or was not drunk and negligent.''

Counsel for appellant separates sundry clauses of this instruction from their context and subjects them to criticism not warranted by a consideration of the instruction as a whole. We think it does not fail to submit the essential elements of the humanitarian rule as applied to this case. [Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482; Zumwalt v. Railway (Mo. Sup.), 266 S. W. 717.] Its language carefully guards against the assumption of facts hypothesized. Instruction numbered 2 is an express warning to the same effect. Even though some facts unnecessary to plaintiff's recovery were hypothesized, thus resulting in placing an unnecessary burden upon plaintiff, yet giving the instruction in that form did not constitute reversible error. [McKenzie v. Randolph (Mo. Sup.), 257 S. W. 126, 128.] Nor does this instruction's hypothesizing of the facts amount to an unwarranted comment on the evidence. [Ward v. Mo. Pac. Ry. Co., 277 S. W. 908, 911, 311 Mo. 92.]

Instruction numbered 4 given at the request of plaintiff is also said to be prejudicial. The instruction is as follows:

''The court instructs the jury that if you find for the plaintiff and against the defendant on the evidence and under the instructions given by the court then in assessing plaintiff's damages, if any, you may take into consideration and account the nature, character and extent of plaintiff's injuries, if any, as disclosed by the evidence, if any, and the physical pain and mental anguish plaintiff suffered, if any, as disclosed by the evidence, if any, and you should allow her such a reasonable amount as you may find and believe from the evidence would fairly and justly compensate her for the injuries if any, disclosed by the evidence to have been caused by the negligence of the receivers or their said agent and servant, if you so find.

''The total amount, if any, allowed the plaintiff cannot exceed the sum of fifteen thousand dollars ($15,000) which is the amount sued for. Naming the amount sued for in this instruction should not influence you in arriving at a verdict or its amount, if any, and is mentioned herein only for the purpose of informing you of the amount for which plaintiff has sued.''

It is said this instruction permitted the jury to consider all of plaintiff's injuries in evidence. On the contrary, it expressly limits her recovery to such ''injuries, if any, disclosed by the evidence to

have been caused by the negligence of the receivers or their said agent and servant." It is also insisted that the giving of this instruction was reversible error because it informs the jury that "the total amount, if any, allowed the plaintiff cannot exceed the sum of $15,000, which is the amount sued for," notwithstanding the instruction further recites that naming the amount sued for should not influence the jury in arriving at a verdict or its amount, if any, "and is mentioned herein only for the purpose of informing you of the amount for which plaintiff has sued." Bond v. Ry. Co., 288 S. W. 777, 785, 315 Mo. 987, and Gruenewald v. Kaysing Iron Works (Mo. App.), 5 S. W. (2d) 709, 714, are cited as supporting this view, but they do not hold that an instruction is subject to this criticism which advises the jury of the amount sued for and at the same time discloses the reason, as in this case, why the court did so. This assignment is ruled against appellant.

Counsel for appellant requested twenty-two instructions. Fifteen of them were given and the remaining seven were refused. Counsel now insist that the court erred in failing to give five of these refused instructions, to-wit, instructions numbered 21, 22, 23, 24 and 26.

Defendant's refused Instruction 21 merely sought the withdrawal of plaintiff's charge "that defendant negligently failed to give a warning or sound its gong prior to the collision complained of." We have already alluded to the deceptive impression that the evidence shows plaintiff and her husband gained as to the ultimate course of the street car as it approached from the east, due to the southwesterly curve of the tracks across St. John Avenue of which they were apparently ignorant up to the time of the collision. The element of defendant's negligence in failing to warn was thus in the case as submitted, differentiating this case from Sissel v. Railway, 214 Mo. 515, 530, 113 S. W. 1104; and Winkler v. U. Rys. Co. (Mo. App.), 229 S. W. 229, 231, cited by appellant. This instruction was properly refused.

Defendant's refused Instruction 22 merely directed the jury that if plaintiff wilfully disregarded her own safety until too late, or if the street car was moving at such a speed that it could not stop after she was in a position of peril, then their verdict should be for defendant. This theory of the case was well covered in defendant's given instruction numbered 15 and the court did not err in refusing this additional instruction.

Defendant's refused Instruction 23 also merely embodies phases of the case fully covered by defendant's given instructions, and it was properly refused.

Defendant's refused Instruction 24 is drawn on the theory that the street car had the right of way. It seems obvious that the case made under the humanitarian rule demonstrates the impropriety

of giving such an instruction, and this point is ruled against appellant. This ruling and the reason therefor apply with equal force to defendant's refused Instruction 26, which is drawn along similar lines.

Appellant's last assignment of error is that the verdict was excessive. As to plaintiff's physical condition immediately prior to the collision, there was substantial evidence that she weighed about 135 pounds, was apparently healthy and suffering from no aches, pains or illness whatever. Dr. C. K. Smith, an eminent specialist in the treatment of urinary diseases, testified that in the spring of 1925 he treated plaintiff for urinary trouble and that "she apparently made a complete recovery." He said he saw her again in October, 1925, and "her condition was excellent at that time. She was robust, well nourished and good color. I would say she looked fat." Dr. Beckett, called as a witness on the part of defendant, identified Exhibit 15 as records made out by him in April and May, 1925, while an interne at the Kansas City General Hospital. These records pertain to a patient therein referred to as "Marie Grubb" and sometimes merely "Grubb." He said that Dr. C. K. Smith was the attending physician and he was the attending interne. The diagnosis disclosed by these records shows hematuria, nephritis and pyelitis. Dr. Beckett further testified that this patient, in giving her personal history, stated that she had gonorrhea ten years previous to her entering the hospital at that time, and he said that "this could be responsible for the condition that existed at that time." His cross-examination indicates that he saw no evidence of gonorrhea. Record of his physical examination of this patient shows her well nourished, neither looking ill nor apparently suffering any pain, skin and reflexes normal, and no abnormalities noted. Urinary analysis showed normal specific gravity, small amount of albumen, no sugar, no casts. An X-ray examination showed normal kidney pelvis and calices. He said that Dr. Smith gave a cystoscopic treatment to the patient's left kidney, and that her condition was improved when she left the hospital.

Touching plaintiff's condition immediately after the collision, the evidence shows that she sustained a jagged wound in the right side of the head, a bruise on her forehead, and bruises in the small of her back and on her knees. She was given emergency treatment at the General Hospital that night. On the next day and for some days thereafter she received medical treatment at her home. The attending physician testified that he found bruising and tenderness right over her kidneys; that for several days her urine was full of blood from the kidneys; that she was in a highly nervous state, complaining a great deal of pain, and he found evidence of a concussion of

the brain; that he continued to treat her for about ten days, during which time an infection developed in the head wound accompanied by a highly nervous condition and fever, and that he then placed her in charge of a surgeon. This surgeon testified that plaintiff's head showed a large lacerated scalp wound filled with sloughing blood and infection; that there was a depression which he diagnosed at that time as a fracture of the skull, although an X-ray examination subsequently made did not reveal a fracture; that there were several recurrences of the infection, causing the scalp to break open and requiring subsequent treatments as late as January, 1926. Plaintiff testified that she was unable to sit up in bed for three or four weeks; that her kidneys were so sore she could hardly turn over; that her limbs, hips and abdomen were sore and her nose bled every morning for five or six days; that after this accident her sister moved to her home to take care of her and do her housework and continued there for seven months; that after she got up she continued to suffer pain in the region of her kidneys and bladder, had great difficulty in retaining her urine, and whenever she was long on her feet or tried to do any work blood appeared in her urine; that these conditions still existed; that her weight was reduced as low as 105 pounds and at the time of the trial she weighed about 115 pounds. Dr. Smith again treated her as a charity patient at the General Hospital in June, 1927. He found her thin and undernourished, with a high fever, nauseated, vomiting, passing blood and pus in urine, and generally very sick. He put catheters up into each kidney, leaving them there about a week for the purpose of cleansing the infected kidneys of pus and debris. This being a rather distressing operation it was repeated only at intervals of about three weeks. He testified that this condition of the kidneys could only have been caused by tuberculosis, cancer, stone in the kidney, infection or injury, and that he discovered no evidence of tuberculosis, cancer or any diseases of any kind that would cause this infection. As to the permanency of this condition, he testified that he thought plaintiff could be improved with treatment but he did not believe she could be cured.

There was other medical testimony that as late as October, 1927, plaintiff gave evidence of a lack of coordination or a disturbance of the nervous system that could have been caused by trauma or injury, and that this condition would be permanent. The burden of appellant's argument as to respondent's condition is not so much that the proof fails to show it serious, progressive and permanent as alleged, but rather that it is the result of prior existing conditions and not due to injuries sustained in the collision. We think this issue was submitted without reversible error, and the verdict of $10,000 is not excessive in view of all the evidence.

The judgment is affirmed. All concur.