Jane YOUNG, a Minor, by Her Next Friend, Betty Young, Respondent,

v.

ST. LOUIS PUBLIC SERVICE CO., a Corporation, Appellant.

No. 46963.

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

Lester F. Stephens, St. Louis, for appellant.

Thomas B. Maloney, Clayton, for respondent.

DALTON, Judge.

Action for damages for personal injuries alleged to have been sustained on account of defendant's negligence. Verdict and judgment were for plaintiff for $15,000. Defendant has appealed.

There is no contention here that a case was not made for the jury, hence a brief statement will be sufficient. On August 10, 1953, plaintiff, a five year old child, accompanied by her mother, Mrs. Betty Young, and a six year old brother, were passengers on defendant's southbound streetcar on Broadway in the City of St. Louis. Mrs. Young signaled for a stop at Utah Street, where she wanted to look at an apartment. When the car stopped, she took both children by the hand, leading them ahead of her, and started to leave by the rear door of the car. The son reached the sidewalk and was released by his mother, but as plaintiff was passing through the exit door and leaning forward to see where she was going to step, the front and rear sections of the exit door suddenly closed, striking plaintiff on each side of her head at the same time and severely injuring her. Mrs. Young, who had stepped down into the stairwell behind plaintiff, was unable to get her in or out of the car until the doors had, in rapid succession, closed five or six times on the child's head. Mrs. Young and other passengers "yelled to the conductor to stop" and he looked back and said "Okay" and stopped the movement of the doors, opened them and let plaintiff and her mother out. The streetcar then went on but, as it left, Mrs. Young took its number.

When plaintiff reached the sidewalk, there was "a mark down both sides of her face from as far up in her hair as you

could see down to the end of her cheeks and jaw. She was crying and screaming." Later that day, she started to complain of a headache "her ears began to bother her" and by 2 p. m. they "were already running." That afternoon, she was taken to Dr. C. P. Lynxwiler, a pediatrician, where she was examined and referred to Dr. Robert Ryan, an ear, nose and throat specialist, for further examination. A Dr. Nemec took X rays of her skull, but no fractures were found. None of these witnesses were called by plaintiff. Other facts will be stated in the course of the opinion.

Error is assigned (1) on the court's refusal to grant defendant a new trial on the ground of newly discovered evidence; (2) on the giving of plaintiff's Instruction No. 1; (3) on the court's refusal to sustain objections to certain argument of plaintiff's counsel to the jury; and (4) on an alleged grossly excessive verdict.

For convenience we shall consider the last assignment first. We shall state the evidence as to injuries favorably to the plaintiff, disregarding defendant's evidence unless it aids the plaintiff's case. Plaintiff was a little more than five years of age when she was injured, August 10, 1953. She was ten years of age at the time of the trial. Suit was instituted December 9, 1953, and a trial had in January, 1958. Plaintiff did not testify.

As stated, Mrs. Young took plaintiff to Dr. Chester Lynxwiler, a pediatrician, for examination on the day she was injured and to Dr. Robert Ryan some four days later. Dr. Ryan examined and treated the child daily for some three weeks and gave her "shots." Thereafter, she was not under a doctor's care and she received no treatment or examination from about September 7, 1953, to April 8, 1954, when she was examined by Dr. Charles E. Eimer, an ear, nose and throat specialist, at the request of the defendant-appellant.

The testimony of plaintiff's mother tended to show that plaintiff had not had any hearing difficulty, ear trouble or "running ears," prior to August 10, 1953; and that she had never complained of headaches or been nervous before that date. After plaintiff was injured, she never did get over her nervousness. She would cry a great deal and also sleep an excessive amount. She wouldn't play like she had before. When she started to school in the fall of 1953 she couldn't hear anybody. She would bring home the wrong pages and often the wrong book for homework, because she had misunderstood what was said. She had to be looking directly at you or she wouldn't answer. The child had never had any such trouble before. During the last four or five years, when she listens to television and radio, she plays it very loud. The same is true when she uses the record player. She cannot hear it otherwise, or understand and enjoy it. She gets upset easily at school and, if she has an argument with a playmate, the same result follows. Any little difficulty brings on a headache. Her eyes twitch and her face moves up and down on the left side. Some of these things did not develop until a few months after plaintiff was injured. She has had to miss considerable school. The child tires easily and wants to stay in bed and rest in the middle of the day. She normally didn't do that, since she quit taking naps when she was only four years old. When the child gets these headaches, which are always severe, she wants to go to bed. Her nervousness has continued to get worse. She cannot stand shrill noises such as from airplanes, streetcars or any loud shrieking noise. Clanging noises also hurt the inside of her head. She puts both hands over her ears and cries and wants to go home. She never wants to go out with the family. Before she was injured she was always eager to go. During the last five years there has been no improvement in the child's condition with respect to headaches and her ability to hear. She also complains of dizziness and cannot bend down to tie her shoes. She cannot lie on the floor to color books, she has to

sit at a table and hold her head up straight. She never had any such trouble before her injury. Her ears have stopped draining but not the headaches and dizziness. Since 1953 she has "never been good in school." She was moved to the front of the class so she would be able to hear, otherwise she couldn't understand what was said.

At the direction of plaintiff's counsel, plaintiff was taken to Dr. Hooper W. Welch, an ear, nose and throat specialist, for examination and hearing tests on May 6, 1955, and again on November 28, 1956. Dr. Welch testified that his examination of plaintiff revealed a slight lateral nystagmus in both eyes and a slight laxity of the facial muscles on the left, indicating a permanent pathological condition. Hearing tests, including the Rinne test, Weber test and audiometric test, showed a definite hearing loss in both ears, more severe in the right. This appeared not only in the air conduction test but also in the bone conduction test which indicated damage to the eighth cranial nerve, which nerve has both a vestibular or balance function and a hearing function. A re-check on May 9, 1955, showed practically the same pattern of loss in both ears. He also found that the plaintiff had a binaural hearing loss of 20.1% computed according to the American Medical Association formula; and that the impairment of plaintiff's hearing was becoming increasingly worse, as indicated by his November 28, 1956, tests. The impairment of hearing is permanent. The hearing loss and the damage to the eighth cranial nerve are to a reasonable degree of medical certainty the result of trauma sustained on August 10, 1953, when the child's head was struck by the streetcar doors. Because of the muscle weakness on the left side of the child's face, Dr. Welch suspected some involvement of the seventh cranial nerve and referred the child to a neurologist, Dr. James F. McFadden.

Dr. McFadden examined the plaintiff on January 5, 1956, and on September 28, 1957. His examinations revealed a marked tremor of the eyelids, weakness of facial innervation on the left, weakness of the tongue on the left side, a horizontal nystagmus, that is, a jerking of the eyeballs when she looks to the right or to the left. It was more pronounced to the left. He also noted a decrease of reflexes of the upper extremities. The left ankle reflex was more active than the right, and the Babinski reflex test was positive. Dr. McFadden testified that, based upon objective neurological findings noted in his examinations, plaintiff had sustained definite structural changes in the brain, more marked on the right side and probably due to a small hemorrhage in the brain. The parts of the brain controlling the seventh and eighth cranial nerves had been damaged.

Dr. McFadden further testified: "It is my opinion that the conditions I elicited were caused * * * by the trauma caused by the first accident * * * by the streetcar doors closing on her ears. In view of the fact that they (these conditions) have extended for more than a year, it is my opinion that they are permanent * * * it can cause her to be retarded in school work."

Other facts shown by plaintiff's evidence are that in 1950 plaintiff did have some ear trouble. She fell on a bobby pin and it went into her ear, but it didn't puncture the skin or injure the ear, nevertheless, her mother took her to Dr. Lynxwiler and then to the City Hospital for examination. They found no damage and plaintiff suffered no difficulty thereafter.

On January 11, 1955, plaintiff was involved in an automobile accident. She was struck by an automobile and knocked some thirty feet. Her sleeve was torn and she was in a state of shock for a few hours. Her head and ears were not hurt. Her lip was cut and she received a breast injury, but she had no doctors to treat her, except for the treatment given the day she was taken to the hospital. A suit for $7,500 was instituted against the driver of the automobile on January 18, 1955, approximately seven days after plaintiff was hit. The pe-

tition in that case covered the whole field of physical injuries, including an allegation that "she sustained a concussion of the brain * * *" and that her head, scalp, face, brain, nose, eyes, ears and nerves were injured. That suit was settled for $1,000.

Defendant's evidence tended to show that the pressure exerted when the streetcar doors close is approximately eight to ten pounds and that twelve seconds is required for the doors to close five times.

 Whether a verdict is excessive can only be determined by a careful consideration of the evidence in the particular case. Plaintiff's age and the nature, extent and permanency of her injuries are paramount factors for consideration. Only the favorable evidence may be considered in determining whether the award is in excess of an amount which will fairly and reasonably compensate plaintiff for the injuries sustained. Brown v. Payne, Mo.Sup., 264 S.W.2d 341, 348. Appellant cites Karnes v. Ace Cab Co., Mo.App., 287 S.W.2d 378, 382(5) (where the injuries were not so severe as those sustained by plaintiff); and Watkins v. West, Mo.App., 297 S.W. 2d 568, 572 (where the excessiveness of the verdict was not considered or ruled). The evidence as to plaintiff's injuries has been reviewed. Giving plaintiff the benefit of the favorable evidence, and all favorable inferences to be drawn therefrom, the verdict is adequately supported by the evidence. We do not find it to be excessive. Rodefeld v. St. Louis Pub. Serv. Co., Mo.Sup., 275 S.W.2d 256, 261.

 Did the court err in refusing to grant defendant a new trial on the ground of newly discovered evidence? It is well settled that a party who seeks a new trial on such ground should (to obtain such relief) be required to show: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different re-

sult if the new trial were granted; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be produced, or its absence accounted for; and (6) that the object of the testimony is not merely to impeach the character or credit of a witness. State v. McLaughlin, 27 Mo. 111, 112; Sang v. City of St. Louis, 262 Mo. 454, 171 S.W. 347, 351; Devine v. Wells, 300 Mo. 177, 254 S.W. 65, 68; Browhaw v. Dowd, Mo.App., 187 S.W.2d 29, 30; Hayes v. Adams, 241 Mo.App. 560, 244 S.W.2d 123, 127.

The newly discovered evidence here relied upon is the fact that plaintiff had been examined by Dr. Thomas M. Martin, a neurologist, on two occasions, to-wit: on April 16, 1956, and on November 6, 1956; and that no neurological pathology was found at the time of either examination. The examinations were made at the request of an attorney defending the action instituted by plaintiff on account of injuries sustained when she was struck by an automobile on January 11, 1955. Dr. Martin found that the Babinski and Achilles reflexes were present, active and equal; and that there was no evidence of "pathological reflexes at all." The ankle jerk and Babinski reflexes were within normal limits. He was of the opinion that "the listlessness that the child complains of can be explained by the presence of the secondary anemia."

The above facts were set out in defendant's motion for a new trial and the affidavit of defendant's counsel was attached stating that the fact of Dr. Martin's examination did not come to his attention until the day after the verdict was returned; and that had he known of these examinations he could and would have used Dr. Martin to contradict the testimony of plaintiff's witness, Dr. McFadden.

 Appellant says the evidence "was not offered at the trial through no lack of diligence of the defendant, but because of the actual false and misleading testimony

of Betty Young," plaintiff's mother. We think the trial court properly refused to grant a new trial on the mentioned ground, because no proper diligence was shown by defendant to discover and obtain the mentioned evidence. Diligence in this connection has been said to mean "that degree of assiduity, industry or careful attention called for under the circumstances of the case and does not require impeccable, flawless investigation in all situations." Foerstel v. St. Louis Pub. Serv. Co., Mo.App., 241 S.W.2d 792, 795.

Defendant's counsel knew of the suit filed by plaintiff as a result of injuries sustained on January 11, 1955. He had the court files in that case and offered a part of the plaintiff's petition in evidence. He knew that plaintiff had filed an amended petition in the present case on February 8, 1957, and had alleged that plaintiff had sustained "a post-traumatic cerebral syndrome; * * * a concussion of the brain; * * * injury and damage to the seventh and eighth cranial nerves on the left" and that "plaintiff's nerves and central nervous system were seriously and permanently injured and damaged * * *." Nevertheless, the defendant did not have plaintiff examined by a neurologist, nor did counsel ask to see and examine the file of the insurance carrier and its attorney who defended the automobile injury case.

It is admitted that, prior to the trial of the present action, the defendant had had Donald Brown, a local claims adjuster for the All-State Insurance Company, "under subpoena to produce in court the records which he had secured from his home office concerning the automobile accident in which plaintiff was injured on January 11, 1955." It is admitted that defendant's counsel "did not call in" said witness at the trial of the cause, nor examine the file of the said insurance carrier of the defendant in that case, which file would have disclosed a report of Dr. Martin's examinations of and findings with reference to the plaintiff's condition on the date of his examinations.

Appellant now contends that, because Mrs. Young had testified by deposition on March 8, 1954 (before either examination by Dr. Martin) that plaintiff had only been seen by Dr. Lynxwiler and Dr. Ryan, defendant's counsel could reasonably conclude that medical attention for the August 10, 1953, injuries were "at an end." Appellant further says that the court files in the automobile injury case contained the deposition of Mrs. Young wherein she had testified that plaintiff's nervousness resulted from the injuries sustained on January 11, 1955. Counsel also says that Mrs. Young's cross-examination in the trial of the present case led him to believe that the only doctors who had seen plaintiff between January 11, 1955, and November 27, 1956 (when the automobile case was settled), were the doctors at the City Hospital on January 11, 1955, and later Drs. Welch and McFadden. While that conclusion might be drawn from the cross-examination, yet it also appears that Mrs. Young was referring to plaintiff's own doctors when she said: "She (plaintiff) didn't have doctors with that one" (the automobile injury). Appellant also says that Mrs. Young's testimony "threw the defendant off of the track of inquiry," and that less diligence is required of the defendant under such circumstances than otherwise. Foerstel v. St. Louis Pub. Serv. Co., supra, 241 S.W.2d 792, 795(3). Appellant also insists that because of Mrs. Young's testimony "there was no apparent reason to have the records of the All-State Ins. Co. examined or brought into court." Appellant also points out that "the defendant was in need of help from a medical doctor who had examined plaintiff during the period that Dr. McFadden had made his examinations"; that Dr. Martin's testimony would have met the need; and that plaintiff's counsel could not then have argued to the jury that plaintiff offered the only witness who was a neurologist and that defendant didn't bring in anyone who was an expert in brain pathology. We think that reasonable diligence would have required counsel to have ex-

amined the All-State Insurance Company file even before Mrs. Young was cross-examined. Having asked for the file and having it available, he should have had it brought into court and examined it, particularly, in view of the similarity of the allegations of injury in the petitions filed in the respective cases.

█ The evidence relied upon is not sufficient to show due and proper diligence to discover and obtain the evidence now referred to as "newly discovered evidence." Grubbs v. K. C. Pub. Serv. Co., 329 Mo. 390, 45 S.W.2d 71, 78(16). Further, the matter of granting a new trial on the ground of newly discovered evidence must always rest to a large extent within the sound discretion of the trial court and the court's ruling on such an issue should not be disturbed except for a clear abuse of the court's decision. Mayor of Liberty v. Burns, 114 Mo. 426, 432, 19 S.W. 1107, 21 S.W. 728; Grubbs v. K. C. Pub. Serv. Co., supra, 45 S.W.2d 71, 78(16); Arnold v. May Dept. Stores Co., 337 Mo. 727, 85 S.W.2d 748, 756; Hayes v. Adams, supra, 244 S.W.2d 123, 127. No abuse of discretion appears from this record. "If the discovery of new, material evidence alone would be ground for a new trial, there would be no end to litigation." Mayor of Liberty v. Burns, supra, 114 Mo. 426, 433, 19 S.W. 1107, 1109, 21 S.W. 728.

█ Appellant further contends that "the Court erred in giving Instruction No. 1 on behalf of the plaintiff for the reason that it attempted to submit the case to the jury on specific negligence but did not require a finding of 'who' did the act charged against the defendant in said instruction, even though the pleadings in the case alleged that a particular 'servant' of this defendant corporation did the act charged."

Plaintiff's Instruction No. 1, submitted a finding, in part, as follows: that " * * * the defendant did cause or permit the doors of said streetcar to be closed upon her, if so, and that she was injured thereby, and if you further find that in so causing or permitting the doors of said streetcar to close upon the plaintiff, the defendant failed to exercise the highest degree of care and was negligent * * *."

Plaintiff's petition charged that the defendant corporation "by and through its agent, servant and operator," caused, suffered and permitted the rear doors of said streetcar to strike, collide with and close upon the plaintiff with great force and violence.

Appellant contends that Instruction No. 1 is broader than the petition and allows recovery for negligence in *maintenance* as well as in *operation*. Appellant argues that because in a res ipsa loquitur submission the defendant must purge itself of negligence in both operation and maintenance, a plaintiff who has pleaded specific negligence in operation should be required to carry that theory forward and that in Instruction No. 1 recovery should have been limited to negligence in operation. It will be noted that there is no requirement that the jury find that any particular individual did the act of closing the doors on plaintiff. Appellant insists that "in order to constitute a submission of specific negligence the instruction must not only identify the particular servant whose negligence is complained of but it must also point out where he was negligent." Schwinegruber v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 782, 786. Appellant further contends that in this case the charge is specific and, since the petition alleged the negligence of a particular servant of defendant, a recovery for the negligence of some other servant is excluded. State ex rel. Spears v. McCullen, 357 Mo. 686, 210 S.W.2d 68, 70; Bergfeld v. Kansas City Rys. Co., 285 Mo. 654, 227 S.W. 106, 109(4).

While Instruction No. 1 did not identify the particular servant whose negligence was complained of in the petition, or limit recovery to his negligence, we do not view the instruction as having given the jury a roving commission to find negligence on

the part of any servant. Plaintiff's evidence identified the servant, as the operator of the car, and showed that he stopped the operation of the doors when asked to do so. The operator of the streetcar, a witness for defendant, testified that, if anybody closed the doors of the particular streetcar on plaintiff's head, it was him, as he was the operator, and that he was "the only fellow who could have closed this door." The cause was tried to the jury upon the sole theory that, if defendant was guilty of any negligence in this case, it was the negligence of the operator of the streetcar. There is no suggestion in the evidence that plaintiff's injuries could have been caused by anybody else. Defendant's evidence tended to show that the car had been properly inspected and there was nothing wrong with it. There was no evidence to the contrary. Instructions 2 and 4 given on behalf of defendant used the same general term "defendant" and did not purport to identify any agent. Instructions 4 and 6, requested by defendant, made reference to Instruction No. 1, and No. 4 contains the words "unless you find that defendant was negligent under Instruction No. 1." No instruction was asked by defendant to limit recovery to the operator's negligence. The acts of no other servant were in question in the trial. On this record Instruction No. 1 was not misleading, confusing or prejudicially erroneous. Hoffman v. St. Louis Pub. Serv. Co., Mo.Sup., 255 S.W.2d 736, 740; Carson v. Evans, 351 Mo. 376, 173 S.W.2d 30, 32(8) et seq. And see Hanser v. Lerner, Mo.App., 153 S.W.2d 806, 810 (3, 4); Banks v. Koogler, Mo.Sup., 291 S.W.2d 883, 891.

■ Appellant further contends that the court erred (a) in overruling defendant's objections to the argument of plaintiff's counsel misquoting the evidence as to the extent of plaintiff's injuries; (b) in refusing to instruct the jury "that they would recall what the evidence actually was"; and (c) in refusing to grant a mistrial when "plaintiff's counsel wilfully and purposefully misquoted the evidence in his closing argument." Appellant cites Holmes v. Terminal R. Ass'n of St. Louis, 363 Mo. 1178, 257 S.W.2d 922, 928(13); Watkins v. West, supra, 297 S.W.2d 568, 572, and other cases.

Appellant points to counsel's argument to the effect that plaintiff "has a serious brain injury and this loss of hearing * * * a definite handicap"; and to argument that Dr. McFadden, "the only neurologist brought into this courtroom, * * * an expert in brain pathology * * * said she has objective signs which indicate * * * brain injury * * * in the seventh and eighth cranial nerves * * * a serious injury." No objection was made to this argument and appellant may not now complain. Appellant also refers to the closing argument to the jury when plaintiff's counsel stated that Dr. Ryan said that plaintiff "had a concussion." Defendant objected and insisted that Dr. Ryan had said that plaintiff "didn't have concussion." The objection was overruled and counsel then asked the court to instruct the jury "that they will recollect what the evidence was." The request was denied.

Without objection, plaintiff's counsel in his opening argument had previously stated that "Dr. Robert Ryan, the eye, ear, nose and throat man * * * testified * * * that this girl had a concussion type of syndrome. A concussion type syndrome is traumatic * * * is the result of a blow. He is an expert." However, the record does not support appellant's contention that plaintiff's counsel "wilfully and purposefully misquoted the evidence" when he last referred to Dr. Ryan's testimony. Counsel emphasized the portion of the testimony favorable to his client and ignored the rest, as appears from the following testimony of Dr. Ryan: "She complained primarily of headache. * * * She had apparently from the history, which is all I can go on, with negative examination, what we refer

to as a post-traumatic type of headache. Q. Did you really come to the conclusion that it was a concussive post-traumatic syndrome? A. That is what I would refer to it as. * * * She had the type of headache that we associate with trauma, which is similar to the type of headache you see with concussion. That doesn't mean she had concussion at all. This was in my opinion an extra cranial type headache, meaning it didn't involve the intra-cranial structures. * * * We call it post-traumatic syndrome type of pain." Dr. McFadden, without objection, testified that, from his positive objective neurological findings, there was definite evidences of structural changes in the brain. "It is my opinion that the parts of the brain that control those two nerves (seventh and eighth cranial nerves) had been damaged." While appellant says this testimony was "beyond the scope of the pleadings," nevertheless, it came into evidence without objection. It is, therefore, immaterial whether the pleadings alleged "brain damage" or not. Section 509.500 RSMo 1949, V.A.M.S.; Musser v. Gen. Realty Co., Mo.Sup., 313 S.W.2d 5, 8(2).

We think there was substantial evidence in the record to support the argument of plaintiff's counsel. In any event the record does not support the charge that plaintiff's counsel wilfully and purposefully misquoted the evidence. Further, the matter of controlling argument is within the sound discretion of the trial court and we find no abuse of that discretion in ruling the objections and requests presented by defendant's counsel during the argument to the jury. Kiger v. Terminal R. Ass'n, Mo.Sup., 311 S.W.2d 5, 11(9); Marler v. Pinkston, Mo.Sup., 293 S.W.2d 385. The assignment is overruled.

The judgment is affirmed.

All concur.