PANSY ARNOLD V. MAY DEPARTMENT STORES COMPANY, a Corporation, Appellant.—85 S. W. (2d) 748.

Division One, July 30, 1935.

728

*Carter & Jones* and *James E. Garstang* for appellant.

*Edward J. Houlihan* for respondent.

730

PER CURIAM:—Plaintiff sued to recover for injury, resulting from dermatitis, alleged to have been caused from a hair dye called Notox, applied by an operator of the defendant. The jury returned a verdict for plaintiff for $12,500. Motion for new trial was filed, but was overruled on condition that a *remittitur* of $3000 be made, which was done, and judgment went for plaintiff for $9500, and defendant appealed.

The petition charges upon five grounds of negligence, viz.: (1) That defendant knew, or by the exercise of ordinary care, could have known, from the information given to defendant by plaintiff, that plaintiff's hair, scalp and skin were susceptible and apt to be burned or affected by Notox, but nevertheless, defendant negligently used Notox; (2) that although defendant knew, or by the exercise of ordinary care, could have known, that plaintiff's scalp, skin and body were susceptible and apt to be burned by the use of Notox, nevertheless, defendant negligently and carelessly used Notox in dyeing plaintiff's hair; (3) that defendant, after being informed by plaintiff that she had suffered from a skin eruption on a previous occasion when hair dye, other than henna had been used, knew, or by the exercise of ordinary care, could have known, by making tests on a small area of the scalp or skin, with said dye, whether or not Notox would likely poison or affect plaintiff's scalp, skin and body, but that defendant failed to make said test; (4) that although defendant advised plaintiff that it would use Notox in dyeing her hair, yet defendant used another liquid or chemical, unknown to plaintiff, in connection with Notox, in dyeing her hair; and (5) that defendant, after being informed by plaintiff that she had suffered from a skin eruption on a previous occasion when hair dye, other than henna, had been used, knew, or by the exercise of ordinary care, could have known, that by sending a sample of plaintiff's hair to the makers of Notox, that defendant could have ascertained if Notox was apt to poison plaintiff's scalp, skin and body, and that defendant failed to do so. The answer is a general denial.

Defendant assigns error: (1) On the refusal of its peremptory request for a directed verdict at the close of the whole case; (2) on the instructions offered by defendant and refused by the court; (3) on the action of the court in permitting plaintiff to go to the jury without any instructions except on the measure of damages; (4) on the refusal of a new trial because of newly discovered evidence; (5) on the argument of counsel; and (6) on an alleged excessive verdict.

We will rule the assignments in the order stated. Plaintiff,

a married woman, thirty-four years of age, on August 16, 1929, went to the defendant's beauty shop in St. Louis, to get advice about having dyed a streak of gray in her hair. She went to the desk of the young lady in charge of appointments and was sent to the operator in booth 17. Plaintiff testified that she told the operator that since she was very young, a streak of gray had run through her hair from front to rear and about the middle. Her hair was black and she told the operator that she had used black henna since she was about nineteen years of age; that "henna took such a long time," she thought, "in the years gone by," something had been found that would not be harmful; that she was very much afraid of dyes, because, one time, about ten years prior, she had gone to a hairdresser in Seattle, Washington, and had "some sort of hair dye on this spot" and had been caused a great deal of trouble; that it had caused her head to break out and that she had intense itching and that because thereof, she had not been able to get out of the house for several days, and she told the operator that she did not want a repetition of this experience. The operator told plaintiff about the hair dye called Notox; that she used it on a great many people and that it was very successful and perfectly harmless, and plaintiff decided to have Notox put on. The operator got the dye ready and put on rubber gloves, and thereupon, the plaintiff said to the operator: "Well, if you have to put on rubber gloves to put that on my hair, what is it going to do to my scalp?" and the operator answered that she had used "these different things all day long" and that if she did not protect her hands, they would be "all dried out;" that what she was using was not "anything but peroxide and ammonia," and that she was putting that on to take out the oil so the dye would "take better." The operator told plaintiff that she would have to put the dye "all over my head," because unless such was done, there would be "different shades."

When the first application was made, plaintiff's scalp began to burn "very badly" and plaintiff spoke to the operator about this and the operator said that this was only natural and that "it will quit in a while." Plaintiff told the operator that she, plaintiff, had used peroxide and ammonia and henna, but that it did not "burn like that," and the operator said that "it was perfectly pure peroxide and ammonia," and plaintiff did not "argue with her." Then the operator "took some bottles and poured out some of one kind and some of another together, and this was the Notox." There were eight bottles in the box the operator used from five of these, so it would appear, and gave to plaintiff, the box containing the remaining three. Plaintiff testified that her scalp began to "burn worse" when the dye was put on. After the dyeing operation was over, plaintiff's hair was waved and she left the shop. The burning continued and in about two hours, a fluid began to come from the scalp and plain-

tiff's face became red and swollen. That night, she could not sleep. Next morning, she went to defendant's shop and showed "the head lady" her, plaintiff's, condition. The head lady called the operator who dyed plaintiff's hair and something was said about seeing a doctor. Plaintiff saw a doctor about six-thirty P. M. on the next day after her hair was dyed, as we understand the record. At that time, plaintiff was "running a very high temperature." The next morning, her "face was quite swollen and my eyes began to swell shut." Plaintiff went to the hospital, and when she arrived there, her eyes were "completely swollen shut and my head was very large and it ached and felt like it was full of water running around, and it began to go down on my neck and my ears were swollen, and this terrible liquid, just like honey, was just oozing out of my hair, and the itching was excruciating. It spread all over my body; as it ran down on to my neck, it kept burning more and more, and every place spread to another."

All, or practically all, of plaintiff's hair came out and the new hair "came in white." That plaintiff sustained grave injury must be conceded, but we will revert to her injuries on the assignment that the verdict, after *remittitur*, is excessive.

Except for evidence as to injuries, plaintiff had no witness, except herself. Defendant's evidence was, in substance, as follows: Miss Beatrice Kunz testified, on direct examination, that she had been doing beauty shop work for twenty-five years; that she was familiar with Notox; that she had used it for over eighteen years; that it is set up in eight bottles, two, two, two and two, and as we understand the record, the first two bottles, when the contents were combined, make a dark or black dye, and that the dye shade grows lighter in the order of the four sets of bottles in a box. Miss Kunz testified that she had never known Notox to poison any one; that it was in general use over the country and used in the best shops. On cross-examination, she said that in the "old days," Notox was known as Inecto; that the manufacturer sends an instructor every three months to instruct the operators using Notox, and that the operators of the defendant, using Notox, were instructed. She testified that if a customer had any eruption on her head, she would not dye her hair, and that if one gave a history of having had an eruption on her scalp, she would not take her. Then, on redirect, this witness stated that if a woman had used hair dye ten years prior and had trouble, but had had none since, she would use Notox on her, "because the system changes every seven years."

Samuel A. Sperber testified that he was a hairdresser since 1907; that he was familiar with and had used Notox; that he had never known it to cause trouble.

Dewey Kolling testified that he was then the manager of the Nugent beauty shop and had been in the business for eight years and was

familiar with Notox; that he had never known of any trouble result-
ing from the use of Notox. On cross-examination, he was asked if
he would use Notox on the head of a person suffering from a scalp
eruption, and answered that he would, unless the case was severe
enough for the attention of a physician; that in such case, an opera-
tor would have to use his or her own judgment.

William V. Kopfstein, a chemist, analyzed Notox and testified .
that the contents of each bottle was eight cubic centimeters, ap-
proximately one-fourth of an ounce; that the contents in the bottle
marked A contained thirty-three hundredths of a gram of a chemical
known as trihydroxy benzein, fifty-two hundredths of a gram of
sodium carbonate, fifty-seven hundredths of saponifiable oil, one
forty-fourth cubic centimeter of ethyl alcohol, and the remainder
water; that the bottle marked B contained hydrogen peroxide, hav-
ing a strength of 5.21 per cent by weight; that any poison that might
be in solution A "would be overcome by the mixing of the two;"
that there should be no poison resulting from the application of the
mixture to the skin. He testified that he was familiar with the
scientific subject of idiosyncrasies a person might have to various
substances; that trihydroxy benzein is used in salves for skin erup-
tions and skin diseases, such as psoriasis and leprosy. On cross-ex-
amination, this witness said that to a person who had some idiosyn-
crasy to the trihydroxy benzein, there might be some toxic effect,
but that he did not think there would be such effect from the mixture
of the solutions in A and B; that he had experimented by making
application of the mixture to his own skin; that he could determine
by such tests, whether he had an idiosyncrasy to the mixture, or was
susceptible to it; that if a person had dermatitis from the applica-
tion of the mixture, such would indicate that such person was sus-
ceptible. He further testified that there are various substances to
which an individual may be susceptible, or have an idiosyncrasy to
or for, depending on the individual; that some of these substances
are foods, some articles of household and "some are out in the air
and flying over the fields." The box of Notox from which the two
bottles came that this witness analyzed contained instructions, and
among the instructions was this: "Notox is the result of a thorough,
scientific research and is safe to use on all normal skins. Predis-
position to skin and scalp diseases always has existed. Persons who
are known to have a pronounced idiosyncrasy to skin or scalp dis-
eases, or who have at the time, any scratch or abrasion to the scalp,
should apply no form of hair coloring."

Rose Ann McAlevey testified that she was manager of the defend-
ant's beauty shop; that she had been there fifteen years and was ac-
quainted with and had had experience with Notox; that she had
known about 3000 people who had their hair dyed with Notox; that ex-
cept the case on trial, she had never known of a case where any one

suffered any bad effects from its use; that at the time plaintiff had her hair dyed "in our department, I was away on my vacation;" that they had an operator named Charlotte Szarek, and as we understand the record, Charlotte was the operator who dyed plaintiff's hair. Miss McAlevey testified that Charlotte went to Chicago about two years before the trial, and that she did not know where she was. On cross-examination, Miss McAlevey testified that Charlotte was a good operator; that she was instructed in the manual, or book of instructions for using Notox; and without objection, she testified that Charlotte knew what was in the manual and knew that persons having a pronounced idiosyncrasy to skin or scalp diseases should not use hair dye.

Mrs. Libby Wigginton testified that she had had five years' experience working in a beauty shop; that she was familiar with Notox and had known of thousands of cases where it was used; that she never knew of a case where any one suffered any skin eruptions or swelling of the face by using Notox.

Miss Edna L. Emme, a member of the examining board which admits hairdressers to practice, testified that she had had eleven years experience; that she was familiar with Notox; had known of several hundred people using Notox and that she had never heard of a case where any one suffered any bad effects from its use; that there was no "taboo or objection to the use of that product by the profession, or by the State."

Dr. Richard S. Weiss, a specialist in skin disease, was asked an hypothetical question, hypothesizing substantially, the background of plaintiff's experience with Notox and the effect upon her, and answered that the condition described would be dermatitis venenata; that dermatitis venenata is an inflammation of the skin due to an external cause and that, in his opinion, the dermatitis which plaintiff had was probably due to the dye; that idiosyncrasy is the term used for describing sensitization; that some people cannot tolerate dye because they are sensitized to the dye; that the substances that are ordinarily harmless are legion that might bring a severe case of dermatitis to a person sensitive to a particular substance; that it could be determined by a simple test, whether or not a person was susceptible to a given substance; example: "take a piece of cotton and saturate it with the material and take another piece without anything on it and place the two pieces on adhesive tape and put them on the skin and leave it there for a few hours, and if the individual is sensitized to the material, there may appear a red spot where the material was applied."

Defendant states in its brief that plaintiff suffered from dermatitis venenata as a result of an idiosyncrasy which she possessed to substances contained in the dye; that she was one person who was sensitized as to this particular dye and that her injuries were not caused

by anything in the dye that was inherently dangerous or poisonous, and cites a number of cases to support the contention that plaintiff cannot recover. In Karr v. Inecto, Inc. (N. Y.), 160 N. E. 398, it appears that the defendant manufactured a chemical known as Inecto Rapid; it represented to the public that this chemical could be used as a hair dye. Plaintiff, in that case, conducted a hair dyeing shop and applied this dye to the hair of a customer; plaintiff had never used this dye on a customer's hair before; the customer brought package containing the dye to plaintiff; the package contained several bottles with directions for mixing and using; she mixed the dye according to directions, and always wore rubber gloves while applying. After she removed her gloves, she washed her hands with soap; she then saw few drops of the dye trickling down her customer's forehead and wiped this off with a piece of cotton; some of the dye stained her right index finger and she washed her hands again, but the stain remained. That night, plaintiff awoke, her finger was red, swollen and painful, and she called a doctor; the finger grew worse and several operations were performed. She alleged in her complaint that the injury to her finger was caused by the dye and that the dye was "inherently dangerous and poisonous" to the skin. At the close of plaintiff's case, the trial court dismissed the complaint. Plaintiff, in that case, was denied recovery because there was no direct evidence that the dye was inherently poisonous or dangerous, and that unless plaintiff could show the connection between the dye and the infection, that she could not recover. In the case at bar, plaintiff recovered, not on the theory that the dye was inherently dangerous and poisonous to the skin, but on the theory that plaintiff was sensitized, or possessed an idiosyncrasy to the dye, which caused her to suffer the injuries complained of, and that defendant knew, or should have known, that plaintiff was so sensitized.

In Drake v. Herrman et al. (N. Y.), 185 N. E. 685, the only question involved was whether evidence tending to support the complaint could be obtained by examination of the defendant. The defendant, Inecto, Inc., manufactured the dye which plaintiff claimed caused her injuries. It was alleged, as in the Karr case, that the dye was inherently dangerous when applied to the scalp. After issue was joined, plaintiff served notice to take depositions; the notice specified that the matters, among others, upon which defendant would be examined, related to the chemicals, poisons, drugs and other ingredients and their percentages used in the dye. All that was held in that case was that plaintiff was not, under the circumstances, entitled to the information sought; that the defendant was not required to disclose its formula.

In Flynn v. Bedell Co. (Mass.), 136 N. E. 252, plaintiff sued to recover for injuries claimed to have been caused by poisonous substances transmitted from a dyed fur collar on a coat purchased from

the defendant. Plaintiff recovered, and on appeal, the recovery was sustained on the theory of an implied warranty. Manifestly, the Flynn case does not support the defendant's contention in the case at bar.

Defendant cites Dradt v. Hollaway (Mass.), 136 N. E. 254, and Gould v. Slater Woolen Co., 147 Mass. 315, 17 N. E. 531, as supporting its contention that its peremptory directions should have been given, but without discussing other cases, it is sufficient to say, that in our opinion, the cases relied upon by defendant, do not support the contention made.

■ In the law of negligence, if a reasonable person can, by the use or exercise of ordinary care, foresee the probability or effect of a given cause, it is sufficient to fasten liability, because what one knows or should know is equivalent in law. An actionable wrong arises in an act or failure to act, or to do or not to do, as a reasonable man would do, under like or similar circumstances. [Benton v. City of St. Louis, 248 Mo. 98, 154 S. W. 473.]

Cahill v. Inecto, Inc., 208 N. Y. App. Div. 191, was for damages for injuries resulting from the use of Inecto Rapid as a hair dye. Inecto Rapid is the name formerly applied to Notox. In the Cahill case it was alleged that by reason of the negligence of the defendant, the dye was inherently dangerous to the skin, and that plaintiff, relying upon the representations of the defendant that the preparation was suitable for use as a hair dye, caused the same to be applied to her head. The evidence showed that plaintiff called upon a hairdresser for the purpose of having her hair dyed; that the hairdresser recommended Inecto Rapid, consisting of two bottles, the contents of which were applied by the hairdresser to plaintiff's head. The operator followed the instructions. Injury resulted similar to plaintiff's injuries in the case at bar. In disposing of the Cahill case, the court said: "We have then a case of a woman, in perfect health, who goes to a hairdresser to have her hair dyed. The latter recommends defendant's preparation, which she has bought from it and which she applies exactly as directed by the defendant's printed instructions. This preparation, defendant represents to be absolutely harmless, except under conditions not here present. Plaintiff then suffers painful and serious injuries as the direct result of the dye thus applied, which her physician testifies, in effect, is the competent producing cause of those injuries, and the sole possible one." It was held that such facts made a prima facie case.

Reed v. Rosenthal (Ore.), 276 Pac. 684, was for injuries alleged to have resulted from negligent treatment in a beauty shop. Plaintiff requested a facial known as "mask of youth." Defendant was not prepared to give the treatment and recommended a boncilla, which plaintiff took. The treatment consisted of hot towels and cold cream applications, followed by a clay application which was

removed when hardened, and then other applications of hot towels, lotions, etc. It was alleged that defendants negligently failed to use disinfecting applications, and used soiled towels and an unsterilized needle to remove blackheads. It was held that the evidence was sufficient to take the case to the jury.

Gerkin v. Brown & Sehler Co. (Mich.), 143 N. W. 48, was to recover for injuries alleged to have been caused by wearing a fur lined coat with a dyed collar, which collar, it was alleged, poisoned the neck. Plaintiff bought the coat from a local dealer who had bought it from the defendant, a jobber. In the course of the opinion, the court said: "When the fact is once established and demonstrated by experience that a certain commodity, apparently harmless, contains concealed dangers, and when distributed to the public through the channels of trade and used for the purposes for which it was made and sold is sure to cause suffering to, and injure the health of, some innocent purchaser, even though the percentage of those injured be not large, a duty arises to and a responsibility rests upon the manufacturer and dealer with knowledge, to the extent, at least, of warning the ignorant consumer or user of the existence of hidden danger."

It is contended by defendant in the instant case that under the facts, the maxim, *volenti non fit injuria* applies. Supporting this theory, defendant cites Atherton v. Kansas City Coal & Coke Co., 106 Mo. App. 391, 81 S. W. 223; Frost v. Josselyn (Mass.), 62 N. E. 469; Gray v. Union Elec. Lt. & Pr. Co. (Mo. App.), 282 S. W. 490; Haselmaier v. Milwaukee Elec. Ry. & Lt. Co. (Wis.), 201 N. W. 257; Churchill v. Baumann (Cal.), 30 Pac. 770.

The maxim, *volenti non fit injuria*, means that to which a person assents is not considered in law as an injury. The maxim has been applied under various circumstances, but under none, so far as we have been able to ascertain, like or closely similar to the facts here. The cases cited by defendant, we think, do not support the theory that plaintiff *assented* to the application of the dye in the *sense* that would justify the application of the maxim, even if defendant had pleaded assumption of risk and contributory negligence, which it did not do, but as stated, the answer is a general denial. Assumption of risk was not, strictly speaking, available, because the relation of master and servant did not exist, yet, if the maxim under the facts was applicable, it could be invoked. [45 C. J. 1042.] The most that can be said under the facts and to the point, is that plaintiff's conduct, knowing that she had, theretofore, had trouble from hair dye, may have been a question of contributory negligence for the jury. In Reed v. Rosenthal, supra, it was held that contributory negligence, not being pleaded and not affirmatively appearing from plaintiff's evidence, was not available as a defense. Such, of course, is the general rule. [Kleinlein v. Foskin, 321 Mo. 887, 13 S. W.

(2d) 648.] It is our conclusion that defendant's peremptory request for a directed verdict was properly refused.

■ Defendant assigns error on the refusal of its withdrawal instructions, E, F, G, H and I. These instructions related respectively to the allegations of negligence in the third amended petition, upon which the cause was tried, and directed that plaintiff could not recover under the particular charge of negligence specified respectively in each of these instructions. The only instructions asked by plaintiff, or given for her, was on the measure of damages. Defendant asked, and the court gave this instruction: "No. 1. You are instructed that if you believe that the products used in dyeing plaintiff's hair were not poisonous when used for dyeing hair and if you further find that plaintiff was sensitized to such products or possessed an idiosyncrasy, which caused her to suffer the injuries mentioned in the evidence, and if you further find that defendant did not know that plaintiff was so sensitized to such products, or of such idiosyncrasy, or could not have known thereof by the exercise of ordinary care, which is such care as an ordinarily skillful hairdresser would exercise under the same circumstances, then your verdict must be for the defendant."

By this instruction, the jury was directed that if they found that (1) the dye was not poisonous; (2) that plaintiff was sensitized or had an idiosyncrasy as to the dye; (3) that defendant did not know, or could not know of such idiosyncrasy by the exercise of ordinary care, then plaintiff could not recover. There was no evidence that the dye was inherently poisonous when applied to the skin; the evidence was that only those who are sensitized to this dye suffer from its use. Regardless of the fact that plaintiff failed to submit an instruction predicating the facts upon which she relied to recover, defendant's given instruction limited recovery to the facts therein stated. It is true that the instruction submitted the facts in a negative way, but no less clear and concise than if in an affirmative manner. In the situation here, defendant has no ground for complaint because of the refusal of the withdrawal instructions. The first three charges of negligence, as stated in the petition, are in effect, that defendant knew, or should have known, that plaintiff would likely be injured by using Notox on her head, and in view of our ruling on the peremptory request, defendant was not entitled to instructions E, F and G. And in view of defendant's given instructions, no harm came by reason of the refusal of instructions H and D. Harmless error will not work a reversal. [Dorman v. East St. Louis Ry. Co., 335 Mo. 1082, 75 S. W. (2d) 854.]

■ Defendant complains because of the refusal of Instruction D, which instruction is as follows: "You are instructed that defendant did not insure plaintiff against suffering from an idiosyncrasy which she possessed to the substances used in dyeing her hair,

and if you find and believe from the evidence that plaintiff was caused to suffer as a result of such idiosyncrasy and that the substances used by defendant were not harmful to the normal person, and if you further find that defendant used such care as would ordinarily be used by a skillful hairdresser, then plaintiff is not entitled to recover and your verdict must be for defendant.''

In defendant's given Instruction No. 1, the jury was clearly and concisely told that no greater burden rested upon defendant than to exercise ordinary care, which was equivalent to directing that defendant did not insure plaintiff against injury. Without again analyzing Instruction No. 1, we think it is sufficient to say that Instruction D is reasonably well covered by Instruction No. 1. It is not error to refuse an instruction when the subject matter thereof is covered by other instructions. [Homan v. Mo. Pac. Ry. Co., 335 Mo. 30, 70 S. W. (2d) 869; Hicks v. Veiths, 46 S. W. (2d) 604.]

█  Was error committed in permitting plaintiff to go to the jury without instructions, except on the measure of damages? In Dorman v. East St. Louis Ry. Co., supra, Judge ATWOOD, in an able and exhaustive opinion, considered this question. We could not add to what is there written and ruled. Previous rulings condoning or approving the practice of submitting a cause to the jury without instructions were disapproved, and it was ruled, speaking of a plaintiff's case, that where the nature of the case requires that the jury be instructed on the issues and law involved, the trial court should refuse to submit the case to the jury without such instructions. Judge ATWOOD, speaking for the court en banc, said: ''As the plaintiff invokes the exercise by the court of its judicial powers and is asking at its hands a redress of a supposed wrong, the court rightfully demands of plaintiff as a condition precedent to the submission of his case that (1) plaintiff set forth in his petition 'facts sufficient to constitute a cause of action,' (2) that he produce competent evidence supporting such facts, and (3) why should he not be required, if necessary to the jury's understanding of its function in the case, to ask the court to give an instruction, formulated by him, as that duty does not devolve on the court, informing the jury what facts, if proven, will warrant the jury in returning a verdict for him. Such instructions, when given and read to the jury, become the law of the case, declared so by the court, and in accordance with which the jury is sworn to return a verdict. It is just as much an exercise of the inherent power and duty of the court to see to it that the jury be informed as to the law of the case as it is that competent evidence be adduced supporting the facts necessary to constitute a cause of action. A failure in this respect constitutes at least prima facie error. When and to what extent the same duty devolves on the defendant need not be discussed.''

In the Dorman case, as in the case at bar, the defendant asked and

was given an instruction which the court held was sufficient on the whole case, and that defendant was not prejudiced by the failure of plaintiff to submit an instruction predicating the facts relied upon for recovery. And, under the facts of the instant case, and in view of Instruction No. 1, given for defendant, we rule that defendant was not prejudiced by the failure of plaintiff to submit an instruction predicating the facts relied upon for recovery.

■ Defendant contends a new trial should have been granted because of alleged newly discovered evidence. In the motion for a new trial, assignment 22, it is alleged that the newly discovered evidence came to counsel for defendant about three hours after the trial and after the verdict was returned; that counsel learned from Dr. Daniel Kauffmann that Dr. Flynn, who testified that he was the physician who attended plaintiff before and after she entered the hospital, was not her physician, but that before she entered the hospital and during the time she was at the hospital, Dr. Kauffmann was her physician; that counsel ascertained that Dr. Flynn did not call Dr. Stryker, but that Dr. Stryker was called in by Dr. Kauffmann, and that Dr. Jones was also called in by Dr. Kauffmann; that counsel ascertained that Dr. Flynn did not treat plaintiff, but visited her in the hospital and saw her for the first time on August 22nd; that counsel ascertained from Dr. Kauffmann that the condition "with. which plaintiff was troubled did not leave her with any permanent disability; that kidney and lung condition resulted from absorption and cleared up;" that counsel, on January 11th, visited the hospital with Dr. Kauffmann and was shown the record and that the record showed that plaintiff. was a patient of Dr. Kauffmann.

Along with the motion, was filed an affidavit by Mr. Garstang, counsel for defendant, reciting that counsel ascertained as to such alleged facts as set up in assignment No. 22, and in the manner therein given. To support a motion for a new trial on the ground of newly discovered evidence, an aggrieved party must show that the evidence came after the trial; that this was not because of lack of diligence; that such evidence is so material that if presented, it would probably produce a different result; that such evidence is not merely cumulative and not merely impeaching. [St. Joseph Folding Bed. Co. v. Railroad, 148 Mo. 478, 50 S. W. 85; Grubbs v. Public Service Co., 329 Mo. 390, 45 S. W. (2d) 71.] All the authorities so agree. Not a word appears in the motion or affidavit about diligence used. The newly discovered evidence is of an impeaching nature. There is no claim that plaintiff was not seriously injured. Granting a new trial on newly discovered evidence rests largely in the discretion of the trial court. [Richardson v. City of Hannibal, 330 Mo. 398, 50 S. W. (2d) 648, 84 A. L. R. 508.] Motions for new trial on newly discovered evidence are not favored and should be examined with caution. [Devine v. Wells, 300 Mo. 177,

254 S. W. 65; Van Meter v. Beckers (Mo. App.),. 42 S. W. (2d) 951.]

Counsel for plaintiff explains in the brief that Dr. Kauffmann was an assistant in the office of Dr. Flynn, but that is not in the record and we do not consider it. It is conceded that Dr. Flynn saw plaintiff in the hospital. After she left the hospital, she was in a hotel and after she left the hotel, she visited Dr. Flynn's office from time to time, and the last time that Dr. Flynn saw her professionally, was in June, 1932. All this appears in the record. Under the showing made, defendant was not entitled to a new trial on the ground of newly discovered evidence.

█ It is contended that error was committed in argument of counsel for plaintiff. The assignment in the brief is that the court erred in permitting counsel for plaintiff to argue to the jury that the pamphlet of the manufacturer of Notox, not offered in evidence, contained statements that Notox was harmful to some people. There is no such assignment in the motion for new trial, hence, the point is not here for review.

█ It is last contended that the verdict is excessive. The verdict on motion for new trial was reduced by *remittitur* from $12,500 to $9500. Speaking of her injuries, plaintiff testified that when she arrived at the hospital her eyes were swollen shut, head very large and ached, ears swollen and itching was excruciating; that the infection spread over the entire body; throat swollen, blisters over body; that the itching and sores did not clear up until in December after the application of the dye in August. She also testified that the trouble recurs; that one of the recurrences lasted nine months; that she was put on a diet while in the hospital as a part of the treatment, and at the time of the trial in January, 1933, she was still on a diet because of her experience with the dye; and that while in the hospital, she was given a medicine to alleviate the itching and she testified that she still took this; that if she missed doing so for a few days, the breaking-out recurred; that while in the hospital, she had pains in the chest like pleurisy pains; had chills and high fever; urine passed frequently with intense burning, and this condition continued until December, when there was a relief for a while, but recurred at intervals. Plaintiff testified that she had pains in her eyes and ears; that she was in the hotel about two weeks after leaving the hospital, and after going home, she returned to her physician at intervals of about ten days to be treated, until in December, after her injuries. She testified that prior to having her hair dyed by defendant, she had not suffered from a condition as she had; that prior, she had a healthy head; that her hair was black, except for the gray streak, and that after using the dye of defendant, her hair all practically fell out, and came back white. She testified that her vision was impaired; that she had difficulty in reading; that when she read for a very short time, the letters

"moved around," and that when she lifted her face from anything she was working on, she could not see across the room; that prior to her injuries, she had no trouble with her eyes; that she could not read at night and could not do any fine needle work; that she was very nervous, easily upset and had terrible headaches, and her body and hands would shake; that prior to her injury, she did "a lot" of drawing, but could not draw any more. She testified that she was a sculptress and had done some painting.

Dr. George W. Flynn testified that plaintiff's whole body was affected, but particularly the upper part; that she developed acute nephritis; almost complete suppression of the urine; that the kidneys became swollen and blocked off; that plaintiff had great difficulty and pain; that the condition was known as cystitis; that her eyes and ears were swollen and the canals in the ears practically closed; that the kidney condition continued for "quite a long time;" that her pain was intense and required opiates for relief; that after she left the hotel, plaintiff visited his office at intervals and that he saw her at intervals, the last time professionally, in June, 1932, and at that time, she had a superficial rash of the itching type; that practically all her joints were involved; that she had arthritis; that her condition was the result of an infection, a poison; and that he was certain "it was a hair dye poison;" that it was necessary to place plaintiff on a diet, and that she would have to stay on a diet. Dr. Flynn also testified that plaintiff's injury indicated permanency.

Plaintiff is a comparatively young woman, married, and at the time of her injuries, resided with her husband in Illinois, but at the time of the trial, she resided in Pennsylvania. On cross-examination of plaintiff, it was developed that she suffered from chronic bronchitis, and had from youth; that her appendix and tonsils had been removed. We do not think that under the facts, as they appear in the record, that the amount of plaintiff's recovery is excessive. We shall not prolong this opinion, undertaking to analyze the cases cited by counsel upon the assignment that the recovery is excessive. As supporting the amount of recovery, plaintiff cites, among others, the following cases: Lyons v. Metropolitan St. Ry. Co., 253 Mo. 143, 161 S. W. 726; Keehn v. D. R. F. Realty & Inv. Co., 328 Mo. 1031, 43 S. W. (2d) 416; Breen v. United Rys. Co., 204 S. W. 521; Wenzel v. Busch, 259 S. W. 767; Furnish v. Mo. Pac. Ry. Co., 102 Mo. 438, 13 S. W. 1044; and Willitts v. Chicago, B. & Q. Railroad Co., 221 S. W. 65.

Finding no reversible error, the judgment should be affirmed, and it is so ordered. *Coles, J.*, dissents.