241 S.W.2d 792 (1951)
FOERSTEL
v.
ST. LOUIS PUBLIC SERVICE CO.
No. 28088.
St. Louis Court of Appeals. Missouri.
July 3, 1951.
*793 Dan P. Reardon, Reardon & Lyng, Gerard M. Dorsey, Lyng, MacLeod & Davidson, and John H. Martin, all of St. Louis, for plaintiff-respondent.
L. F. Stephens, Coburn, Storckman & Croft, and Clem F. Storckman, all of St. Louis, for defendant-appellant.
HOUSER, Commissioner.
This is an action for damages on account of personal injuries claimed to have been sustained by John Foerstel in an automobile-streetcar collision in St. Louis on April 23, 1949. Following a $5,000 verdict for plaintiff and an unsuccessful effort to obtain a new trial, the public service company has appealed to this court claiming that the trial court erred in (1) refusing to grant a new trial on the ground of *794 newly discovered evidence; (2) giving humanitarian Instruction No. 1 when the evidence failed to show definitely when plaintiff came into a position of peril or the sufficiency of the time thereafter in which to avert the collision; (3) improperly sustaining plaintiff's objection when defendant argued to the jury that an unfavorable inference should be drawn against plaintiff for his failure to call as a witness a doctor who took X rays of plaintiff's back; (4) improperly admitting a doctor's opinion based upon the opinion of another doctor and upon X rays not then in evidence; and (5) not setting aside the verdict as excessive.
In this opinion we will review the evidence only insofar as it touches the particular assignments of error.
Defendant's claim that it is entitled to a new trial for newly discovered evidence springs from the following factual background: as a result of the collision plaintiff complained of injury to his back. Plaintiff's case was based upon a broken back. Plaintiff's counsel in his opening statement outlined no injuries to plaintiff other than a fractured vertebra, spasticity of the back muscles, and pain in the lower portion of the back. Plaintiff testified that when the streetcar struck the automobile he felt a pain in the small part of his back, that "it felt like a snap there." He mentioned no personal injuries other than back injuries. Plaintiff's three doctors testified that a series of X rays made after the date of the collision, taken in three positions, anterior-posterior, lateral and oblique, revealed dark lines in the third lumbar vertebra. It was their opinion that these lines demonstrated fractures and were due to injury.
Plaintiff's first doctor said the X rays "clearly show" fracture; that the fracture in two places "is obvious"; that the muscle spasm which persisted four days after the collision was a symptom indicative of fracture; that these fractures could have been caused in the accident. He further testified that it was not a developmental condition; that developmental anomalies "do not occur in that region"; that "if these lines were due to congenital development they would not be localized strictly to the third lumbar vertebra" but that a number of adjacent vertebrae would be involved; that his films show irregular "raggedy" edges which are characteristic of fracture; that if the lines are perfectly smooth they are congenital anomalies.
Plaintiff's second doctor thought plaintiff's back should be immobilized as a fracture and treated him for a fracture. He regarded it as an injury, a fracture, and not as a developmental condition; stated that the latter always shows a "rounded border" whereas in trauma you have a "jagged tearing."
Plaintiff's third doctor said plaintiff had a broken back; that the third lumbar vertebra had been broken; that it was a fracture, a break in the continuity of the bone; a roughening at the pars interarticularis; that it was "evident this was a fracture" which appeared "as if it were of fairly recent origin"; that in his opinion it was not a developmental condition; that in congenital abnormality the break in continuity is "smooth" and there is no roughening; that there is roughening and eburnation of bone which would be "indicative of trauma rather than a developmental affair." This question was asked him, "Now, so that we will get it clear once and for all and there can't be any confusion, do I understand you to say that this is not of developmental or congenital origin but rather is the result of trauma?" The doctor answered "That's right. In my opinion it is the result of injury * * * trauma."
The newly discovered evidence consisted of records and X rays of plaintiff at City Hospital in St. Louis made in July, 1948, more than 9 months prior to the date of the collision in question, which showed the same condition in the same vertebra. It appears that on July 19, 1948 plaintiff was brought to City Hospital in a police scout car suspected of having a back and kidney ailment. He was received by the hospital. Three X ray pictures were taken to determine if he had kidney stones. The pictures showed the pelvic region including the lumbar vertebra.
*795 The motion for new trial on the ground of newly discovered evidence was supported by three affidavits two of which bore on the question of diligence; the third on the medical phaseand by letters written to the trial judge by eight doctors after comparing the 1948 and 1949 X rays. Defendant's two doctors who testified at the trial that it was a developmental condition and not a fracture, restated that opinion after the comparison. One doctor, whose 1949 X ray report indicated fracture to him, wrote the judge that his comparison showed the same condition in the 1948 X rays that appeared in the 1949 films. Dr. Wendell Scott, who did not testify at the trial, wrote that the irregularities seen in both 1948 and 1949 X rays were "all developmental defects and are not the result of injury." One of plaintiff's doctors who testified at the trial that it was a fracture and not a developmental condition reversed his opinion after viewing the 1948 X rays. Another of plaintiff's doctors after examining the 1948 films concluded: "The bony changes present in the third lumbar vertebra can be seen on these films taken 7-19-48 and therefore prior to the recent accident of 4-23-49."
We have concluded that the 1948 hospital record and X ray films and the circumstances under which this evidence was discovered meet all of the requirements to justify and require the granting of a new trial on the ground of newly discovered evidence within the six requirements set forth in Browhaw v. Dowd, Mo.App., 187 S.W.2d 29. (1) The evidence came to defendant's knowledge after the trial. (2) It was not owing to want of diligence that this evidence did not come to defendant's knowledge sooner. Diligence in this connection means that degree of assiduity, industry or careful attention called for under the circumstances of the case and does not require impeccable, flawless investigation in all situations. In this case plaintiff on August 25, 1949 in his deposition answered "no" to this question asked by defendant's counsel: "Have you ever been hospitalized in St. Louis for any reason?" Defendant thus was thrown off the trail by an answer which, if given truthfully, would have led defendant straight to the files of City Hospital. In that circumstance the degree of diligence required of defendant in the conduct of its subsequent investigation as to the pre-existence of the back condition is surely reduced to the minimum. Plaintiff argues, however, that this court cannot consider the question and answer because the deposition is not a part of the record in this case, was not in evidence, and was never identified, offered or received by the trial court. This position is untenable. The fact was brought to the attention of the trial court at the argument of the motion for new trial. It was not objected to then, or later, nor has the fact been controverted at any stage of the proceeding that the question and answer actually appeared in the deposition. Therefore it should and will be considered and weighed notwithstanding the technical considerations advanced. Bradley v. City of Spickardsville, 90 Mo.App. 416, loc. cit. 425. A court of review is not to be hamstrung by such technicalities in its search for truth. Such a handicap would make a mockery of appellate review and give a new and bizarre meaning to the blindfold over the eyes of the Goddess of Justice.
In asserting defendant's lack of diligence plaintiff in effect is saying "You were not alert enough to discover my deception prior to trial, and therefore you are deprived of any benefit from what you have discovered since." There is an element of estoppel involved. A plaintiff in a personal injury lawsuit who gives false and misleading testimony concerning his medical history is in no position to raise the question of his adversary's diligence in discovering the truth with respect to that history. The law does not exact perfection on the part of the defendant in uncovering damaging evidence which, if disclosed by plaintiff when called for, would have prevented the compounding of many errors; and the concealment of which in this case misled defendant's counsel and resulted in an imposition upon three eminent doctors and, as it appears, upon the jury. It is also apparent from this record that plaintiff imposed upon his own lawyers. They had no knowledge whatever of *796 the existence of the 1948 X rays or hospital record or of any prior X rays. It is plain that plaintiff's counsel had nothing whatever to do with the concealment of this evidence.
We do find that defendant met and sustained the burden to inform itself with respect to plaintiff's health. In preparing for trial defendant caused subpoenas to issue and to be served on the Police Department (of which plaintiff was a member) "to secure all records pertaining to the health of John P. Foerstel" and on Deaconness and St. Mary's Hospitals in St. Louis to produce records and X rays of plaintiff. Furthermore, defendant's investigator made a telephone call to the record room of City Hospital in St. Louis and talked to a Mrs. Wilson, who informed him that they had no records or X rays of John P. Foerstel. Under the circumstances of this case this constituted due diligence. It was not necessary to send a representative to City Hospital or any other hospital to make a personal investigation, or any investigation beyond a telephone call, after plaintiff had testified under oath that previously he had not been hospitalized in that city. (3) The newly discovered evidence was so material that it probably would produce a different result if a new trial were granted. The injury to his back, which plaintiff successfully convinced the jury was a broken back, was the only basis of his claim of injury. The 1948 X rays not having been in evidence at the trial, the entire medical controversy revolved around the question whether the dark lines plainly visible in all of the X rays taken in 1949 were a fracture caused by the collision or a congenital, developmental deformity which predated the collision. In the absence of an X ray of that particular vertebra taken prior to the collision the solution of that question rested wholly in the realm of opinion evidence. It is apparent from letters written by the plaintiff's doctors to the trial judge that had the 1948 X rays been available for them to read and interpret before the trial, the unanimous opinion of the five doctors who testified at the trial would have been that the abnormality was not the result of the street car-automobile collision on April 23, 1949. Eliminate the lines of the third lumbar vertebra and the only complaint plaintiff has is muscle spasm, pain and injury to the soft tissue. The newly discovered evidence quite literally and figuratively "took the backbone out" of plaintiff's case, converting it into a comparatively minor personal injury claim. It is quite conceivable that had the 1948 X ray plates been available for use at the trial a defendant's verdict would have resulted. (4) It was not cumulative only. It was a different kind and type of evidence. A film showing a pre-existing condition, and a hospital record to fortify it, is of a wholly different kind and type of evidence than the opinion of a doctor. It is demonstrative, tangible, and in this instance served a much more important function than that of merely adding another opinion on the issue. This evidence if accepted settled the issue. If it was genuine it ended all controversy over the question whether the dark lines across plaintiff's third lumbar vertebra existed prior to the collision in question. Devine v. Wells, 300 Mo. 177, 254 S.W. 65.
No question is raised concerning the fifth and sixth requirements as set forth in the Browhaw opinion, supra, and there is no need to analyze the matter further. It is clear that the newly discovered evidence meets all of the tests.
In addition, no counter affidavits showing lack of diligence were filed by plaintiff and this is a fact which carries weight in arriving at the conclusion that due diligence was exercised. In re Reichelt's Estate, Mo. App., 179 S.W.2d 119.
Nor has plaintiff at any time since the discovery of this evidence, either in the trial court or here, contended that the evidence is untrue or that the doctors have misconceived its effect. He does not claim that the 1948 X rays of his back were not taken or that they do not demonstrate the pre-existence of the condition for which he sought damages. He controverts neither the fact nor the effect of the damaging evidence newly discovered.
Although a trial judge is vested with a large measure of discretion in the *797 matter of either granting or refusing a new trial on the ground of newly discovered evidence and it is only in the case of abuse of discretionary power that an appellate court will interfere with the action taken by the trial court, Van Meter v. Beckers, Mo.App., 42 S.W.2d 951, we are driven to conclude that the trial court erred in not granting defendant a new trial on this ground.
The question whether a humanitarian case was made is of importance in the event of another trial. The undisputed testimony shows that plaintiff had parked his car on the north side of Olive Street, an east and west thoroughfare 35 to 40 feet wide from curb to curb; that there is a double set of streetcar tracks on Olive and not enough room between the westbound streetcar tracks and automobiles parked on the north side of Olive to permit an automobile to pass between a streetcar and parked cars; that the car plaintiff was driving was parked in a row of automobiles; that there was a space of 3 feet in front and of 4 or 5 feet behind plaintiff's automobile.
Plaintiff claims that he made a humanitarian case on testimony that after he backed up toward the east preparatory to pulling away from the curb he looked at the east and saw the westbound streetcar which eventually struck his automobile; that at that time the streetcar was approximately 300 feet east of plaintiff, and was traveling at a speed of 15 miles an hour; that plaintiff then moved diagonally forward a distance of about 6 feet until the left front wheel of his automobile was over or south of the north rail of the westbound streetcar tracks; that at that time the motor of his automobile died and the car stalled; that he then looked and saw the streetcar approximately 200 feet toward the east; that at that point it was clanging its bell. Plaintiff tried to start the motor and made three attempts, pressing on the starter, before the motor again began to run. When he had restarted his motor he looked and saw the streetcar about 20 feet to the east. Plaintiff said that he decided to back up into the hole from which he had emerged and had almost backed off the streetcar tracks when the automobile was struck. There was evidence that the motorman was looking ahead along the tracks; that the streetcar could be brought to an emergency stop in the following disstances at the following speeds:
Speed Distance
25 90 feet
20 40 feet
15 30 feet
There was evidence that the operator was traveling 15 miles an hour when he began to make the emergency stop in this instance, and that he stopped in 30 feet. A witness named Wright who was a passenger on the streetcar, testified that when the streetcar was approximately 100 feet from the point of collision he felt the brakes on the streetcar being applied and heard the bell being sounded.
If these facts were untainted by selfcontradictory evidence given by plaintiff they would make a submissible case under the humanitarian duty to stop, which was the negligence relied on in Instruction No.1. Defendant, however, raises the point that there is a discrepancy in plaintiff's testimony which renders his version of the facts speculative and conjectural as to when plaintiff came into a position of peril. On direct examination plaintiff testified that the second time he looked at the streetcar it was 15 to 20 feet away as follows:
"Q. * * * you told us you saw him about three hundred feet away at a normal rate of speed. When you saw him the second time, when you decided to back out of there, did he appear to increase his speed or decrease it? A. I would say he was going the same rate of speed.
"Q. Going the same rate of speed; and how far was the streetcar away from you when you saw him that time? A. Oh, maybe twenty feetfifteen or twenty feet.
"Q. Fifteen to twenty feet; is that right? A. Yes, sir."
On cross-examination plaintiff testified that the second time he looked at the streetcar it was 200 feet away, as follows:
"Q. Then the motor died? A. Yes, sir.
*798 "Q. And did you immediately then look again to the east to see where the streetcar was? A. Yes, sir.
"Q. And how far was it away at that time? A. Oh, about two hundred feet, I guess.
"Q. Three hundred feet when you first saw it, and two hundred feet when you saw it the second time when your motor had died; is that right? A. Yes. I am guessing at it; I don't know just exactly.
* * * * * *
"Q. I mean I don't want you to guess; I want you to say from the best of your knowledge. A. I can't say exactly; I have to guess. I would say two hundred feet.
"Q. That is your best estimation? A. Yes, sir."
Obviously if plaintiff pulled onto the track when the streetcar, traveling 15 miles an hour, was only 15 to 20 feet away from him it would have been impossible to stop the streetcar at that speed within that distance. If those were the facts no submissible humanitarian case was made. Contra, if plaintiff pulled onto the track and came to a dead stop on the tracks when the streetcar, traveling 15 miles an hour, was 200 feet away from him there would have been ample opportunity to stop and a case would have been made.
Conceding that plaintiff thus testified to contradictory facts on a material element of his humanitarian case and that it was error to submit the case on that theory, what is this court called upon to do? Defendant does not ask for an outright reversal and entry of judgment for defendant. Defendant asks for a new trial. Since we have determined that there must be a new trial on another ground there is no necessity of laboring the point further except to say that where a party relies on his own testimony alone to prove a material issue and his testimony thereon is so contradictory and conflicting that it lacks probative force and is self-destructive and where there is no other fact or circumstance tending to show which version of the evidence is true, no case is made for the jury. In that event the jury will not be permitted to speculate or guess as to which statement is true. Sparks v. Auslander, 353 Mo. 177, 182 S.W.2d 167; Steele v. Kansas City Southern Ry. Co., 265 Mo. 97, 175 S.W. 177; Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644.
It is possible that plaintiff had some explanation or excuse for the discrepancy, which through inadvertence was not given. There are circumstances which indicate that the truth lay in plaintiff's version that the streetcar was 200 feet away when plaintiff's automobile stalled upon the tracks, namely, the testimony that the bell was clanging when the streetcar was that distance away, and the testimony of the witness Wright, supra, which indicated that the operator had commenced to decelerate the speed of the streetcar when still 100 feet from the point of collision. Therefore, in view of these facts and of the nature of defendant's request and in the interests of justice plaintiff should be given an opportunity to resubmit his case to another jury.
Since the matter raised by the third assignment of error, supra, could arise on another trial, we should consider it. It seems that although Dr. P took X rays of plaintiff's back at Deaconness Hospital, plaintiff did not call Dr. P to testify for him. Nor was he called by the defendant. In final argument defendant's counsel, after commenting on the failure of plaintiff to produce Dr. P, said to the jury: "Now I submit that we should not have called Dr. P for the reason he could have stood upon his position as a doctor wherein he could refuse to testify in this action." Plaintiff's counsel objected that this is not the rule of law, and the court sustained the objection.
The record does not bear out the contention that the court refused to allow defendant to draw an unfavorable inference from plaintiff's failure to call Dr. P. That argument was made, and no objection was interposed to it, nor until the quoted words were said. The objection was made to the effort of defendant's counsel to excuse the failure of defendant to call plaintiff's doctor to the stand.
*799 Certainly the defendant was entitled to draw the unfavorable inference from plaintiff's failure to call his own doctor. McInnis v. St. Louis-Southern, Inc., 341 Mo. 677, 108 S.W.2d 113. Could the doctor have stood upon the statutory privilege and refused to testify if defendant had placed him on the stand? We think not. The privilege created by Mo.R.S.A. § 1895, R.S.Mo.1949, § 491.060, is personal to the patient and is not a privilege of the doctor. Wells v. City of Jefferson, 345 Mo. 239, 132 S.W.2d 1006. Nor under the circumstances could plaintiff have asserted the privilege, for he waived it by calling three doctors who testified freely concerning his condition, and by his own voluntary testimony concerning his physical condition. Wells v. City of Jefferson, supra; Bouligny v. Metropolitan Life Ins. Co., Mo.App., 160 S.W.2d 474. There was no error in the action of the court in sustaining plaintiff's objection to the argument of defendant's counsel.
The fourth assignment of error grows out of the action of the court in overruling defendant's objection to Dr. V. K. basing his opinion that plaintiff had suffered a fracture upon an opinion of another doctor and upon an X ray not then in evidence. There is no occasion to pass upon this assignment of error. The matter will not arise if there is another trial for the reason that after Dr. V. K. saw the 1948 X rays he reversed his opinion, concluded that there was some abnormality of the vertebra as early as July 19, 1948 and that no fracture occurred in the accident of April, 1949.
Nor need we consider the assignment of error that the verdict was excessive. Our determination of the question whether a $5,000 verdict is excessive on the basis of the evidence before the jury would be of no value whatever on a retrial because the character and range of the medical evidence on a second trial, if one is had, necessarily will be radically different from that adduced at the first, in view of the revelations made by the 1948 X rays discovered after the trial
It is, therefore, the recommendation of the Commissioner that the judgment of the circuit court be reversed and the cause remanded for a new trial.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, reversed and the cause remanded for a new trial.
ANDERSON, P. J., and McCULLEN and BENNICK, JJ., concur.