**Robert HIGGINS, Respondent,**

v.

**STAR ELECTRIC, INC., Appellant,**

v.

**CITY OF KANSAS CITY, Missouri, Third–Party Defendant.**

**No. WD 50352.**

Missouri Court of Appeals, Western District.

Nov. 7, 1995.

Keith W. Ferguson, St. Joseph, for appellant.

Martin M. Bauman, Bauman & Thackery, St. Joseph, for respondent.

Before LAURA DENVIR STITH, P.J., and LOWENSTEIN and HANNA, JJ.

LAURA DENVIR STITH, Judge.

Defendant/Appellant Star Electric, Inc. appeals the trial court's denial of its Motion for a New Trial in this personal injury action for damages allegedly suffered by Plaintiff/Respondent Robert Higgins as the result of a construction accident. Star Electric contends that a new trial should have been granted based on newly discovered evidence regarding the extent of Mr. Higgins' injuries and based on evidence that Star Electric says shows that Mr. Higgins committed perjury during the trial. Second, Star Electric contends that the trial court erred in submitting a comparative fault instruction which stated that the jury could assess fault to plaintiff if plaintiff "knew or should have known" that the conduit was energized. Star Electric contends that the jury instruction should have instructed the jury that it could assess fault to plaintiff if plaintiff "suspected" the conduit was energized.

The judgment of the trial court denying Star Electric's Motion for new trial based on newly discovered evidence is reversed and the case remanded for a new trial on the issue of damages only. We find that the newly discovered evidence would not affect the jury's finding of liability and that the court's jury instructions on the issue of liability were not erroneous. We therefore affirm the portion of the judgment denying a new trial on the issue of liability and affirm the jury verdict for plaintiff on that issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of a claim for personal injury which Plaintiff–Respondent Robert Higgins suffered as the result of a construction accident involving a live electrical wire. Mr. Higgins was an asbestos removal worker for Asbestos Abatement, Inc. Asbestos Abatement was hired to remove asbestos materials from a building at the old Kansas City Municipal Airport. Star Electric, Inc. was hired by Asbestos Abatement as the electrician for the project. It was Star Electric's responsibility to turn off all electricity to the areas of the airport in which employees of Asbestos Abatement, including Mr. Higgins, were working.

In September, 1991, while Mr. Higgins was working on the project, Star Electric and Asbestos Abatement informed him and other Asbestos Abatement employees that someone unknown to Star Electric had been turning on the electricity that Star Electric had previously disconnected. The employees, including Mr. Higgins, were warned to be aware of this and to immediately stop work and report any wires which they thought might be energized.

On the date of the accident, Mr. Higgins was removing a conduit which ran across the ceiling of a room at the airport. Mr. Higgins was informed by Star Electric that all electricity to the conduit had been shut off. Mr. Higgins stood on a ladder and struck the conduit with a hammer, knocking it loose from the ceiling. An electric cable was located inside the conduit.

Mr. Higgins said that, as he was working on the conduit, he touched the line and "got

stuck, I thought I'd got a metal burr." Mr. Higgins did not stop at that point and report this event to his supervisor. Mr. Higgins instead ran his hand up and down the line. Feeling no metal burr or shock, Mr. Higgins resumed his work. When he again struck the line with his hammer, he received an electrical shock which caused him to fall off the ladder. He landed around his belt area, then on his shoulders, head and neck.

Mr. Higgins developed a pain in his neck a day or two after the accident. He initially saw a chiropractor and ultimately was treated by a physician with medication and physical therapy for a pinched nerve.

After the injury, Mr. Higgins continued to work for Asbestos Abatement at the airport until he was laid off. A few months later, in December, 1991, he began working for Communication Equipment Specialist ("CES"), making concrete tower foundations. The pain in his neck progressively worsened, ultimately causing Mr. Higgins to stop working. He testified that he then tried operating a backhoe business, but was unsuccessful because he suffered severe pain when he turned his head and looked over his shoulder.

In April, 1993, Mr. Higgins filed suit against Star Electric, alleging that Star Electric negligently caused his injury by failing to properly turn off the electricity in the area in which he was working. Mr. Higgins' deposition was taken in January, 1994. During his deposition, Mr. Higgins was first questioned regarding other injuries or accidents *prior* to the accident at the airport which resulted in medical treatment, as follows:

> Q: All right, I'm going to talk about previous accidents and injuries. What injuries have you had to any parts of your body that required either hospitalization or medical treatment?

Mr. Higgins then recited several incidents in which he had previously sustained injuries including a broken arm, severed finger, stitches in his hand, and an injured elbow.

Mr. Higgins was then asked "Have you had any previous medical treatment to your back or neck ever?" Mr. Higgins answered that prior to the accident he had received chiropractic treatment to his neck and back.

Mr. Higgins was then asked whether he had experienced any injuries or accidents since the accident for which he sued, as follows:

> Q: Okay. How about any accidents or injuries since November—Excuse me—September the 11th, 1991.
>
> A: None.
>
> Q: Have you had any other sicknesses or diseases that you haven't discussed that required hospitalization or medical treatment?
>
> A: No.

Mr. Higgins thus denied having had any accidents or injuries since the injury for which he sued. Later in the deposition, however, when Mr. Higgins was specifically questioned about other automobile accidents, he testified:

> Q: Have you ever been in any automobile accidents?
>
> A: Yeah, Yes.
>
> Q: Have you ever been in any automobile accidents where you received any type of physical injuries?
>
> A: No.
>
> Q: They've all been minor accidents where you didn't receive any injuries?
>
> A: Right.
>
> Q: Did you ever seek any treatment, for example, go to any hospitals or doctors as the result that you thought something may have been wrong with you from any automobile accidents?
>
> A: No.

Thus, at this point in the deposition, Mr. Higgins stated that he had been in other automobile accidents—when they occurred is not clear—but denied receiving any injuries as a result. No followup questions were asked about automobile accidents which did

not result in physical injuries or medical treatment, or as to when any of these accidents occurred.

Star Electric also submitted written interrogatories to Mr. Higgins. One of the interrogatories called for Mr. Higgins' current address. Mr. Higgins provided the address at which he then resided. When Mr. Higgins subsequently moved back to his sister's house, however, he failed to update his interrogatory answers with his new address.

Star Electric hired a private investigator to investigate the extent of Mr. Higgins' injuries and his current activities. The investigator was unable to uncover useful information because, as just noted, Mr. Higgins had moved, and the investigator reported that he was unable to determine Mr. Higgins' new address.

At the trial of this case in July, 1994, Mr. Higgins was asked as follows about any injuries to his neck since the fall at the airport:

Q: Had you received any injury since you fell off the ladder and injured your neck that day? I mean any injury to your neck?

A: No.

Mr. Higgins also testified at trial that he was in severe pain and unable to do most things that he used to be able to do without pain. He said he was unable to sit for any length of time because his neck would freeze. Even as a passenger in a vehicle, Mr. Higgins said he could not get comfortable. He was not asked at trial about accidents not resulting in injuries.

Prior to submission, Star Electric offered the following jury instruction on the issue of comparative fault:

### Instruction A

In your verdict you must assess a percentage of fault to plaintiff, Robert Higgins, whether or not defendant Star Electric was partly at fault, if you believe:

First, plaintiff Robert Higgins *suspected* that the conduit upon which he was working was energized, and

Second, plaintiff Robert Higgins failed to stop his work and report the conduit, and

Third, plaintiff Robert Higgins was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause any damage plaintiff Robert Higgins may have sustained.

(emphasis added).

Over Star Electric's objections, the trial court refused to submit Instruction A to the jury, and instead submitted Instruction No. 6. Instruction No. 6 differs from Instruction A only in the first paragraph, which states that:

First, plaintiff Robert Higgins *knew or should have known* that the conduit upon which he was working was energized.

(emphasis added).

The jury returned a verdict in favor of Mr. Higgins in the amount of $185,000.00, and judgment was entered in that amount. Star Electric filed a Motion for a New Trial alleging newly discovered evidence and error in the comparative fault instruction.

According to Star Electric's Motion For New Trial, immediately following the trial the attorney for Star Electric was contacted by a Mr. Edward Sprake. Mr. Sprake told Star Electric's counsel that, since the accident at the airport, he has witnessed Mr. Higgins, among other things: (1) ride four-wheel All Terrain Vehicles ("ATV"); (2) work for hours underneath vehicles, including putting in transmissions and engines; (3) build a deck; (4) carry a gun and go hunting; (5) walk the Missouri river bluffs hunting for mushrooms; (6) play softball in various positions including catcher and centerfield; and (7) operate the controls of a backhoe during a "backhoe rodeo" wherein a saddle was placed on the arm of the backhoe and participants were "bucked off" the backhoe.

A hearing on Star Electric's Motion was scheduled for September 28, 1994, but was rescheduled because two witnesses, Mr. Sprake and his daughter, Jackie Brown, did

not appear. The hearing was rescheduled for November 8, 1994, and Mr. Sprake and Ms. Brown attended pursuant to a writ of body attachment.

Mr. Sprake and Ms. Brown both testified at the subsequent hearing that they did not attend the first hearing because they were informed by Mr. Higgins' attorney that they did not have to attend the hearing because the subpoena they received had not been signed by the trial judge himself.

Mr. Higgins testified first at the hearing. When questioned regarding his activities following the accident at the airport, Mr. Higgins admitted that they included riding a four-wheel vehicle, trying to play softball on one occasion, operating a backhoe, pushing several trees over with a pickup and engaging in mechanical work on his car and that of Mr. Sprake.

Mr. Higgins also admitted taking part, since the accident, in a "backhoe rodeo." During this "rodeo", a saddle was strapped to the boom on the backhoe. Participants sat on the saddle while Mr. Higgins operated the controls of the backhoe moving the saddle side to side and up and down in an attempt to knock them off. Mr. Higgins said he could operate the backhoe despite the injuries because he did not have to turn his head, and that it was turning his head which caused him pain as a result of the accident.

Mr. Higgins also admitted that he had been in an accident in which he rolled a van over on its side in June or July, 1993, a year prior to trial and almost two years after the accident, and that the van was totally wrecked in the accident. When confronted with his deposition testimony denying any accidents or injuries, he admitted he must have given that testimony under oath but volunteered no explanation for the inconsistency in his testimony. When asked about whether he had nonetheless injured his neck in the 1993 van accident, the following exchange occurred:

Q: Sir, were you injured in the van accident that you had when the van was flipped?

A: No.

Q: *Did it hurt your neck at all, sir?*

A. *Well, yeah, it hurt my neck. My neck always hurts.*

Q. Did it increase the problems with your neck?

A. No, its the same. *I mean it increased it that instant amount. It's back like it is all the time now-a-days* where I've got a stiff pain in the neck.

(emphasis added).

Star Electric also called Edward Sprake to testify at the hearing. Mr. Sprake testified that, while he and Mr. Higgins had been long-term friends, a recent event between Mr. Sprake's estranged wife and Mr. Higgins had caused a serious breach in their friendship. Mr. Sprake, however, claimed his Fifth Amendment privilege and refused to answer any questions regarding the information that Mr. Sprake had previously provided or stated he could not remember. Ms. Brown, Mr. Sprake's daughter, did testify. She said that Mr. Higgins had been involved in a van accident in June or July of 1993 but she was not aware whether or not he was injured as a result of that accident. She also said she was aware that in July of 1993 he had flipped over a truck in the hills near Mr. Sprake's house.

Star Electric also entered into evidence depositions taken after trial of Susan O'Callaghan, Carl O'Callaghan and Kenneth Carter. None of the three witnesses had shown up for their depositions the first time the depositions were scheduled. They later said that they had received a letter from Mr. Higgins' counsel telling them that, since they had not been subpoenaed, they did not have to appear, and at least one witness was told it would be in her best interests not to do so. They were subpoenaed to appear the next time the depositions were scheduled.

Each of these three witnesses testified that they had been at the party at Mr. Sprake's house and witnessed the backhoe rodeo. They testified that Mr. Higgins was operat-

ing the backhoe during the rodeo. During this activity, they testified, the backhoe was jumping as much as a foot off the ground. Moreover, Mr. Higgins was bounced around as much as the individuals riding in the saddle and his neck was turning side to side. That night they also witnessed Mr. Higgins throw firecrackers into a fire and run away, and push a car over with two or three other men.

The trial court denied Star Electric's Motion for New Trial without entering written findings of facts or conclusions of law. This appeal followed.

## II. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL AS TO DAMAGES BASED ON NEWLY DISCOVERED EVIDENCE

Star Electric contends that the trial court erred in denying its Motion for a New Trial based on the newly discovered evidence regarding Mr. Higgins' physical activities following the accident. Star Electric contends that the reason that this newly discovered evidence was not discovered prior to trial was not its lack of due diligence, but was the result of Mr. Higgins' misconduct which prevented Star Electric from discovering this information.

### A. Standard of Review of Denial of New Trial.

In its motion for new trial, Star Electric alleged that it discovered Mr. Higgins' subsequent accidents and activities only once it was contacted by a new witness, Mr. Sprake, after trial. Star Electric says that Mr. Higgins not only failed to identify Mr. Sprake prior to trial, but also affirmatively misled it and prevented discovery of Mr. Sprake by Star Electric's investigator through Mr. Higgins' failure to update his address. Moreover, Star Electric says, Mr. Higgins' statement at his deposition that he had no accidents or injuries between the time of the injury for which suit was brought and the deposition, affirmatively misled Star Electric

and prevented it from discovering the evidence of subsequent injuries or accidents which Star Electric says Mr. Higgins admitted to at the post-trial hearing.

Star Electric argues that this evidence meets the standard for grant of a new trial. As recognized in numerous cases, a new trial will be granted only upon proof of the following elements:

(1) The evidence has come to his knowledge since trial,

(2) due diligence would not have uncovered the evidence sooner,

(3) the new evidence is so material it would probably produce a different result,

(4) the new evidence is not cumulative,

(5) the affidavit of the witness must be produced or its absence accounted for, and

(6) the object of the evidence is not to impeach the character or credit of a witness.

*Carthen v. Jewish Hospital of St. Louis*, 694 S.W.2d 787, 800–01 (Mo.App.1985). The trial court has wide discretion in ruling on a motion for a new trial and is vested with substantial discretion over matters of fact in ruling on new trial motions. *Oventrop v. Bi-State Dev. Agency*, 521 S.W.2d 488, 492 (Mo.App.1975). However, "a reviewing court is more liberal in upholding the action of the trial court which has sustained a motion for a new trial than when the trial court has denied such relief." *Id.*

It is clear that the first, fourth, fifth and sixth elements are met here. The question on appeal is whether elements two and three are met. In regard to the second element—due diligence—it is well-established in Missouri that in the usual case a new trial will not be granted "unless the movant can show that the evidence in question could not have been obtained in time for trial by the exercise of due diligence." *Morgan v. Wartenbee*, 569 S.W.2d 391, 398 (Mo.App.1978). Due diligence is defined as "that degree of assiduity, industry or careful atten-

tion called for under the circumstances of the case and does not require impeccable, flawless investigation in all situations." *Young v. St. Louis Public Service Co.*, 326 S.W.2d 107, 112 (Mo.1959) (citations omitted).

■ To show due diligence, "allegations of facts" are required and not "unsupported statements of diligence." *Estate of Brewster*, 809 S.W.2d 183, 185 (Mo.App.1991) (citations omitted). Bald assertions that a party was not negligent in failing to discover evidence sooner do not suffice. *Morgan*, 569 S.W.2d at 398. Where the witnesses were neighbors, witnesses or good friends that could have been easily discovered, due diligence is not shown. *See, e.g., Gehner v. McPherson*, 430 S.W.2d 312 (Mo.App.1968) (party did not use due diligence when it failed to discover a witness who was the nearest neighbor).

Mr. Higgins contends that the new witnesses—Ed Sprake and his daughter—were "long time friends and family" of Mr. Higgins and that Mr. Higgins "in his deposition identified Mr. Sprake as one of his friends," and that under *Gehner* and similar cases his failure to discover them constituted a lack of due diligence.

We believe *Gehner* is distinguishable because the newly discovered witnesses in this case were not at the time friends of Mr. Higgins. Rather, Mr. Sprake testified that "bad blood" had developed between him and Mr. Higgins. The three other witnesses who observed Mr. Higgins operating the backhoe testified that they had only met Mr. Higgins on the night of the backhoe rodeo.

Moreover, while Mr. Higgins did testify that he spent his free time with Dave Sprake, he did not identify Ed Sprake in his deposition (contrary to Mr. Higgins' counsel's contention on appeal), and thus counsel had no opportunity to contact Ed Sprake. Defense counsel did diligently contact Dave Sprake after learning his name at the deposition, but Dave Sprake informed counsel that his testimony would be favorable to Mr. Higgins.

Even more importantly, however, here, unlike in the cases cited by Mr. Higgins, there was evidence that Mr. Higgins sought to affirmatively mislead Star Electric as to the extent of Mr. Higgins' injuries and as to alternative causes for some of them, i.e., Mr. Higgins' later van accident.

■ Where the plaintiff has affirmatively misled defendant as to a significant matter such as this, it has long been held that less diligence will be required. *Foerstel v. St. Louis Public Service Co.*, 241 S.W.2d 792 (Mo.App.1951). In *Foerstel*, plaintiff sued for personal injuries suffered as the result of an automobile accident. In a deposition prior to the trial, the plaintiff answered "No" to the question "Have you ever been hospitalized in St. Louis for any reason?" *Id.* at 795. After the trial it was discovered that plaintiff had been hospitalized in St. Louis prior to the automobile accident in question for the same type of injury he was claiming arose from the accident.

Defendant's motion for a new trial based on newly discovered evidence was denied by the trial court in *Foerstel*. The Court of Appeals reversed, explaining that when a defendant is actually affirmatively thrown off the trail of evidence by a false answer by the plaintiff, that "the degree of diligence required of defendant in the conduct of its subsequent investigation ... is surely reduced to the minimum." *Id.* Thus, *Foerstel* held that in such a case the plaintiff is, in effect, estopped to deny due diligence, stating:

> A plaintiff in a personal injury lawsuit who gives false and misleading testimony concerning his medical history *is in no position to raise the question of his adversary's diligence* in discovering the truth with respect to that history. The law does not exact perfection on the part of the defendant in uncovering damaging evidence which, if disclosed by plaintiff when called for, would have prevented the compounding of many errors; and the concealment of which in this case misled defendant's counsel....

*Id.* (emphasis added.)

■ We agree with Star Electric that Mr. Higgins' misleading answers during his depo-

sition, his failure to update his interrogatory answers, in combination with his testimony at trial, demonstrate an intent by Mr. Higgins to mislead Star Electric, and justified the application of the more minimal diligence standard set out in *Foerstel.* We further find that, as in *Foerstel,* this standard was amply met here.

First, Mr. Higgins specifically denied during his deposition that he had been in any accidents or received any injuries since September, 1991, a clear misstatement of fact. He had rolled his van over and totalled it, and he had rolled over a truck in the hills near the Sprakes' home. Later, in his deposition, he admitted that at undisclosed times he had been in automobile accidents, but again specifically denied that he had been in "any automobile accidents where you received any type of physical injuries."

This deposition testimony was in clear contrast to his testimony at the post-trial hearing. At that time, Mr. Higgins admitted that he was injured in the van accident, although he tried to minimize the seriousness of the injury, stating: "Well, yeah, *it hurt my neck. My neck always hurts* ", and further that "I mean *it increased it that instant amount. It's back like it is all the time now-a-days* where I've got a stiff pain in the neck." (emphasis added).

By his own testimony, Mr. Higgins thus admitted that he hurt his neck in the van accident, and that at least for some period of time afterwards, the pain in his neck was increased. It was not up to Mr. Higgins to decide whether this injury was sufficiently serious that the jury should hear about it, or for him to decide whether its effects lasted up to the time of trial. That was a matter which the jury should have decided after hearing all of the evidence, including the evidence about Mr. Higgins' van rollover.

Moreover, if Mr. Higgins had provided the information about the van accident, not only would Star Electric have found out about the injury he suffered in that accident, but it also could have led Star Electric to Ed Sprake, as he is the one who helped Mr. Higgins turn the van back over after the accident. This then could have lead to the other information Star Electric discovered through Ed Sprake as to Mr. Higgins' activities such as playing softball, driving ATVs, and driving the backhoe in the backhoe rodeo, all matters Star Electric instead discovered only after trial.

The effect of the misleading nature of Mr. Higgins' deposition testimony was exacerbated by Mr. Higgins' other conduct in failing to update his interrogatory answers with his new address. As a result, Star Electric's private investigator could not locate Mr. Higgins or witnesses who could tell him about Mr. Higgins' many post-accident activities.

There was also other evidence that counsel for Mr. Higgins informed Ed Sprake, the key witness for Star Electric, and Mr. Sprake's daughter, that they did not have to appear at the hearing on Star Electric's Motion for New Trial despite the fact that Star Electric actually had served them with subpoenas commanding their attendance. While the latter actions of counsel occurred after trial, and thus did not themselves prevent pre-trial discovery of evidence by Star Electric, they nonetheless are part of a course of conduct by counsel which is a relevant factor for this Court to consider in determining whether Mr. Higgins' failure to answer truthfully in his deposition resulted from an intent to mislead.

We find that, in light of this and all of the other evidence discussed above, the evidence demonstrated that Mr. Higgins intentionally misled Star Electric. The more minimal diligence standard set out in *Foerstel* therefore applied, and as a matter of law that minimal standard was met by the evidence outlined above.

■ Finally, it is evident that evidence that Mr. Higgins had been in a van accident in which the van rolled over and was "totalled" and which injured his neck to at least some extent, and the other newly discovered evidence of his post-accident activities, satisfied the materiality element of the test for grant of a new trial. The evidence was in

complete contrast to Mr. Higgins' trial testimony that he had no other injuries to his neck and that he was in severe pain and unable to do almost anything that he could do prior to the accident. The jury's finding as to the amount of damages clearly may have been quite different in light of this evidence. *See Fahy v. Dresser Industries, Inc.*, 740 S.W.2d 635, 643 (Mo. banc 1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988).

■ However, we do not see how this evidence could have affected the jury's determination of liability, as it depended on issues which were *not* affected by the newly-discovered evidence. We therefore remand for a new trial on the issue of damages only, finding that the newly-discovered evidence would not affect the jury's finding of liability. *Burnett v. Griffith*, 769 S.W.2d 780, 790 (Mo. banc 1989).[1]

## III. THE TRIAL COURT DID NOT ERR IN REFUSING APPELLANT'S COMPARATIVE FAULT INSTRUCTION

Under Point II Star Electric contends that the trial court erred in refusing to give its offered jury instruction on comparative fault. We disagree.

Star Electric's Instruction No. A required a finding of comparative fault if Mr. Higgins "suspected" that the conduit was energized.[2] The court refused to give this instruction and instead submitted Instruction No. 6. That instruction required a finding of comparative fault if Mr. Higgins "knew or should have known" that the conduit was energized. Star Electric contends that it was error for the trial court to give this instruction because it does not follow the substantive law of Missouri on comparative fault.

■ In evaluating non-MAI instructions, this Court determines whether the instruction clearly communicates a correct characterization of applicable substantive law and is understandable. *Ryan v. Parker*, 812 S.W.2d 190, 193 (Mo.App.1991). The criteria utilized to determine whether an instruction is correct is "whether an average juror would correctly understand the applicable rule of law, and whether a jury was not or could not be confused or misled, resulting in prejudice to one of the parties." *Stone v. Duffy Distributors, Inc.*, 785 S.W.2d 671, 678 (Mo.App. 1990) (citations omitted). An instruction is also considered prejudicial where "it submits a legal question in an abstract way giving the jury a roving commission to return a verdict without being limited to any issues of fact or law developed." *Citizens Bank v. Schapeler*, 869 S.W.2d 120, 129 (Mo.App.1993). The prejudicial effect of an erroneous instruction is to be determined by the court. *Id.*

■ In fashioning Instruction No. 6, the trial court relied upon well-established Missouri law which holds that in determining whether contributory negligence applies, the jury shall expect "a person, of full capacity, to use ordinary care for his own safety to avoid a *known* danger." *Calderone v. St. Joseph Light & Power Co.*, 557 S.W.2d 658, 665 (Mo.App.1977) (emphasis added). *See also Tellis v. Union Electric Co.*, 536 S.W.2d 742, 746–47 (Mo.App.1976).[3] This requirement is also reflected in MAI, which requires

---

1. Because of our resolution of this issue, we need not reach the separate issue whether Mr. Higgins' misstatements amounted to perjury. We note, however, that perjury can be based only on trial testimony, not on deposition testimony. *Gilliam v. Chicago & N.W. Transp. Co.*, 859 S.W.2d 155, 161 (Mo.App.1993).

   We also find no merit in Mr. Higgins' motion to dismiss the appeal because Star Electric's Statement of Facts allegedly did not comply with Rule 84.04's requirement of a "fair and concise statement of the facts relevant to the questions presented for determination without argument."

Mr. Higgins' Motion to Dismiss the Appeal as Frivolous is also denied. Star Electric's appeal presents a "justiciable question" and is not "devoid of merit." *See Bowman v. Burlington Northern, Inc.*, 645 S.W.2d 9, 13 (Mo.App.1982).

2. The full text of the jury instruction is set forth above in the factual section of this opinion.

3. Star Electric contends that the trial court erred in relying on these cases as they actually involve contributory negligence and not comparative fault. The Missouri Supreme Court adopted the pure form of comparative fault in *Gustafson v.*

use of the phrase "knew or should have known" in a similar context. *See, e.g.,* MAI 32.23—Product Liability—Contributory Fault (plaintiff "knew" and "appreciated" risk).

Star Electric recognizes that Instruction No. 6 follows the usual MAI language in requiring a finding that the plaintiff "knew or should have known" of the danger that the electrical line was energized. Star Electric argues that a different instruction was required here, however, because Mr. Higgins had been instructed by his employer to report any conduits that *he thought* might be energized. By failing to report the burr he felt when he touched the line, despite suspecting that this might mean the line was energized, it claims that Mr. Higgins negligently failed to follow his employer's directions and this is what caused his injuries. In support, Star Electric cites to *Stone v. Duffy Distributors, Inc.,* 785 S.W.2d 671 (Mo. App.1990).

The plaintiff in *Stone* sued for personal injuries as the result of a collision between his vehicle and some beer kegs that fell off of a distributor's truck. Plaintiff injured his back in the accident but thereafter did not follow his doctors' instructions not to lift heavy objects. Defendant argued that plaintiff's recovery should be reduced by the extent that plaintiff was contributorily negligent for not following his doctor's instructions. *Id.* at 677–78.

The comparative fault instruction directed the jury to assess a percentage of fault to plaintiff if it found plaintiff "failed to follow the instructions of his doctors, and . . . was thereby negligent." *Id.* at 676. Plaintiff objected to the instruction, in part, because it did not require that plaintiff have knowledge of his herniated disc at the time his doctor gave him the instructions. *Id.* at 677.

*Stone* rejected this argument, noting that the plain meaning of the instruction "refers to what Stone was told by his doctors. When he was told, he knew." *Id.* at 677–78. It thus held that "[m]easured by common sense . . . [the instruction] requires the jury to find that Stone knew of the instructions told to him by his doctors." *Id.* at 678.

 *Stone* is not controlling here, for in *Stone* the jury instruction specifically submitted plaintiff's negligence in failing to follow his doctor's instructions. Below, by contrast, it was disputed as to whether Mr. Higgins failed to follow his employer's instructions and Star Electric's proposed instruction did not submit Mr. Higgins' failure to follow his employer's, or Star Electric's, instructions about energized lines as negligence. Rather, Star Electric's proposed instruction merely stated that the jury could assess fault to Mr. Higgins if it found that Mr. Higgins "suspected" the line was energized. The instruction did not tie Mr. Higgins' suspicions to a failure to follow the employer's instructions, nor did it require the jury to find that such a failure was negligent.[4] Therefore, the trial court did not err in submitting Instruction No. 6, and in rejecting Instruction A, for the latter was vague and misstated the law.

For all of the reasons stated above, the judgment of the trial court denying Star Electric's Motion for New Trial based on newly discovered evidence is reversed as to the issue of damages and the case is remanded for a new trial on damages only. The judgment in favor of plaintiff on the issue of liability is affirmed.

All concur.

*Benda,* 661 S.W.2d 11, 15 (Mo. banc 1983). While this affected the method by which damages are calculated, the elements of the defense have not changed and the discussion of contributory negligence in past cases is relevant to consideration of comparative fault. *Wilson v. Danuser Mach. Co., Inc.,* 874 S.W.2d 507, 510 (Mo. App.1994).

4. For the same reasons, Star Electric's citation to *Barkley v. Mitchell,* 411 S.W.2d 817 (Mo.App. 1967), regarding the failure to follow a company rule as the test for negligence, is distinguishable from the current case.